United States District Court

For the Northern District of California

1
2
3
4
5
6
7

**NOT FOR CITATION**

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10
11
12   DAVID WESLEY HAWKINS,
13          Petitioner,                              No. C 03-3668 PJH
14       v.
15                                                   **ORDER DENYING PETITION**
                                                     **FOR WRIT OF HABEAS CORPUS**
16   JOHN CAVALLI, Chief, Santa Clara
     County Probation Department
17
18          Respondent.
     _____/
19          Before the court is the petition for writ of habeas corpus filed by David Wesley

20   Hawkins ("Hawkins"), pursuant to 28 U.S.C. § 2254.  In response to an order to show

21   cause why the writ should not be granted, the state filed an answer, and Hawkins filed a

22   traverse.  Having reviewed the parties' papers, the record, and having carefully considered

23   their arguments and the relevant legal authorities, the court hereby DENIES the petition.

24                                       **BACKGROUND**

25   **I.    Procedural History**

26          On August 17, 2000, a jury in the Santa Clara County Superior Court convicted

27   Hawkins of one count of accessing without permission and taking, copying, or using data

28   from a computer system, under California Penal Code § 502(c)(2).  The trial court placed

United States District Court

For the Northern District of California

1  Hawkins on formal probation for three years, on the condition that he serve six months in

2  jail.  The California Court of Appeal affirmed Hawkins' conviction on June 5, 2002, and the

3  California Supreme Court denied review on August 28, 2002.  Hawkins subsequently filed a

4  petition for writ of certiorari before the United States Supreme Court, which denied the

5  petition on February 24, 2003.  Hawkins then filed a habeas petition with the California

6  Supreme Court, which denied the petition on March 26, 2003.  Hawkins filed the instant

7  habeas petition with this court on August 6, 2003, raising six claims for relief as set forth

8  below.

9  **II.    Factual History**

10       Hawkins' conviction under California Penal Code § 502(c)(2) stems from the

11 following facts, a more extensive summary of which may be found in the state appellate

12 court's June 5, 2002 decision.  Hawkins was charged with taking the source code of his

13 former employer, Network Translation Incorporated ("NTI").  Source code is "an annotated

14 text, written in a programming language intelligible to humans, that represents the set of

15 instructions comprising a particular computer program."  *Data Gen. Corp. v. Grumman Sys.*

16 *Support Corp.*, 36 F.3d 1147, 1157 (1st Cir. 1994).

17       John Mayes ("Mayes") formed NTI in January 1995 to market his product, Private

18 Internet Exchange ("PIX").  PIX allowed a computer in a local network to access the

19 Internet by assigning the computer an Internet protocol address necessary for such access.

20 PIX also functioned as a firewall, preventing people outside a company from accessing the

21 company's computers over the Internet.  Mayes had the idea for PIX in March 1994, and

22 hired a programmer to write the original code.  Mayes first sold PIX in December 1994.

23       On October 4, 1995, NTI hired Hawkins as a technical support engineer, a job that

24 involved receiving and answering customer complaints about PIX.  Hawkins had previously

25 worked at other technology companies, including Sun Microsystems.  As a technical

26 support engineer at NTI, Hawkins had access to NTI's source code.  At the time Hawkins

27 was hired, NTI was still a small company with five or six employees.  In late October 1995,

28 Cisco Systems ("Cisco") acquired NTI by a stock exchange.  Mayes insisted that Cisco

2

United States District Court

For the Northern District of California

1   retain all NTI employees after the acquisition.

2        In December 1995 or January 1996, Hawkins began talking with Larry Coryell

3   ("Coryell") and Debbie Appler ("Appler") about developing a product to compete with and

4   improve upon PIX.  Appler and Hawkins had previously worked together at a company

5   called Alantech, and Coryell and Hawkins first met when they became neighbors in 1985.

6   Neither Appler nor Coryell was an employee of NTI.  In their work with Hawkins, Appler was

7   primarily a marketing person, and Coryell was a programmer.  Beginning in April 1996,

8   Coryell began writing code for Hawkins.  Hawkins gave Coryell hand-written block

9   diagrams about how the product should work, and sometimes asked for more features after

10  looking at the code that Coryell had written.

11       Meanwhile, back in March 1996, Hawkins and Andrew Foss ("Foss"), another NTI

12  and Cisco employee, created a program to check stock quotes.  While writing the program,

13  Hawkins and Foss consulted an example of a particular computer program function about

14  which Hawkins had questions.  The example they consulted, which was on Hawkins'

15  computer at Cisco, was from the Sun Microsystems operating system source code,

16  versions 4.1.3.  Foss was familiar with the Sun operating system, because his prior

17  employer had licensed it.  Foss testified that the operating system was highly controlled,

18  and his access to it at his prior job was logged.  In addition, the files that Hawkins and Foss

19  consulted had headers identifying them as copy-protected property of Sun Microsystems.

20       Foss was surprised to see the Sun operating system source code on Hawkins'

21  computer.  He cautioned Hawkins that he should not use the code while doing Cisco

22  business and should probably not even have it on Cisco's computer network.  Hawkins

23  explained to Foss that he moved the code from his home directory when he stopped

24  working for Sun.  Foss testified at trial that it is common for UNIX engineers to take their

25  personal home directory computer files with them when leaving a job.  Foss also testified

26  that he had no reason to believe either that Hawkins had the code inadvertently or

27  intentionally.

28       Foss acknowledged at trial that the Sun operating system that he observed on

3

**United States District Court**
For the Northern District of California

1   Hawkins' computer was derived from Berkeley Software Distribution ("BSD"), which makes

2   its source code available for free on the Internet.  Because the BSD source code was in the

3   public domain, programmers were free to copy it onto their computers and even

4   incorporate it into their own code.  Foss testified that he was unaware to what extent there

5   was an overlap between BSD and Sun's operating system.  However, Hawkins

6   acknowledged to Foss that what he had was the Sun operating system, as opposed to

7   BSD, and Foss testified that he was unaware that any part of the Sun operating system,

8   version 4.1.3, was released to the public.

9       In about mid-July 1996, Hawkins told Mayes, NTI's founder, that he was leaving NTI

10   and Cisco.  Hawkins said he was going to stay with a friend in Hawaii for three to six

11   months and do nothing.  Subsequently, on August 12, 1996, Hawkins and Coryell

12   networked three computers in Coryell's home, in order to test the code that Coryell had

13   written in conjunction with the project to develop a product to compete with NTI's PIX.

14   Coryell provided a Sun computer and Hawkins provided two PCs.

15       Hawkins' last day at Cisco was August 16, 1996.  Thereafter, Coryell stopped writing

16   code for Hawkins in December 1996, due to health reasons.  Appler had already dropped

17   out of the project with Hawkins and Coryell prior to that time.  In 1997, Hawkins formed a

18   company called Meridian Network Systems ("Meridian").  With others, Hawkins began to

19   market a product called Aegis, which was based on the code that he had developed with

20   Coryell.  Aegis was intended to compete with NTI's PIX.

21       In May 1997, Mayes was attending a Las Vegas trade show called Interop.  While

22   there, he observed signs that looked like NTI signs at the Meridian booth.  When Mayes

23   approached the booth wearing his Cisco badge, Meridian personnel in the booth turned off

24   all of the computer screens.  Mayes then observed Hawkins in the Meridian booth.  He told

25   Hawkins that Aegis looked very similar to PIX, and Hawkins responded that Meridian was

26   seeking a different market.  Mayes reported his encounter at the Meridian booth to Cisco,

27   and Cisco obtained Meridian's Aegis product for evaluation.  Johnson Wu ("Wu"), a Cisco

28   employee and an original NTI employee, tested Aegis and reported the similarities between

4

United States District Court

For the Northern District of California

1  Aegis and PIX, in a message dated May 20, 1997.

2       On August 8, 1997, San Jose police officers executed a search warrant for Hawkins'

3  apartment.  District attorney investigator John Smith ("Smith") coordinated the investigation,

4  and computer expert, Gordon Galligher ("Galligher"), went along for technical assistance.

5  Galligher observed that Hawkins had a local area network set-up.  The network included

6  two Sun workstations called Vette and Camaro.  The network also included a PC Windows

7  system and the build computer.[1]  Galligher's first responsibility was to locate and disable

8  any Internet connection, so Hawkins' computer could not be externally altered while the

9  officers' search was in progress.  Galligher accomplished this by unplugging the wireless

10 Internet connection.

11      Investigator Smith made a backup tape to copy the contents of Hawkins' Windows

12 computer.  Smith also wanted to look at the Sun machines.  Hawkins told the investigating

13 officers that the Sun machines were his target machines, meaning that they represented

14 the outside world in testing a firewall feature.  Hawkins also stated to the officers that the

15 Sun machines had nothing on them.  Smith entered a computer command on Camaro, one

16 of the Sun computers, that provided a listing of the directories on that machine.  Galligher

17 noticed two directories, both labeled "D.W.H. S.R.C. N.T.I."

18      Up to this point, Hawkins had been joking with the officers, but he stopped joking

19 once the officers observed the above files.  Investigator Smith looked inside the Sun

20 computer directories and observed a number of source code files labeled dot C and dot H.

21 Expert Galligher opined that these were source code files, based on his observation of the

22 copyright notices for NTI.  At that point, Smith decided to seize the two Sun workstations.

23 The Sun workstations were in evidence at trial, and the files on the Camaro computer

24 proved to be versions of NTI source code in existence at about the time that Hawkins

25 stopped working for Cisco.

26      During the search,  Investigator Smith asked Hawkins why those files were on his

27 _____

28      [1] A "build" refers to the "result of building a piece of software on a particular occasion."
*See* Douglas Downing, Michael Covington, and Melanie Mauldin Covington, *Barron's Dictionary of Computer and Internet Terms*, 66 (Barron's, 8th ed. 2003).

United States District Court

For the Northern District of California

1   computer.  Hawkins replied that he always makes a backup of his home directory when he

2   leaves a company, in order to keep his standard start-up files.  Hawkins maintained that if

3   he had copied Cisco source code, it was an accident.  Hawkins denied using the Cisco

4   source code to create his own product.

5       While the Camaro computer was at the district attorney's office, Investigator Smith

6   used a UNIX file listing command to display and print the most recent access dates of all

7   the files on the computer.  There were several access dates to the PIX source code files

8   after August 16, 1996, when Hawkins stopped working for Cisco.  Some source code files

9   were accessed on December 5, 1996, and others on May 15, 1997.  As for the December

10  5, 1996 access, Galligher opined that so many files on the computer had been accessed on

11  that date, that it could have been the result of a global backup.[2]  The access on May 15,

12  1997 was more selective, and included access to the Ethernet driver file.[3]

13      Galligher acknowledged in his trial testimony that the access dates did not specify

14  who accessed the files, and that various UNIX commands can cause access to a file

15  without a person actually reviewing the file's contents, and even without the awareness that

16  one was accessing the file.  Galligher also testified at trial that a systems administrator

17  could change the time on a computer clock, which might affect the reliability of the access

18  dates that were listed when Investigator Smith ran the UNIX command.  However, Galligher

19  testified further that it appeared the computer's clock was functioning properly when the

20  PIX source code files were accessed on Hawkins' Camaro computer, which would suggest

21  that the computer access dates were a reliable indicator of when the source code files were

22  last accessed.

23      An evaluation of Hawkins' Aegis source code demonstrated that Coryell wrote

24

25      [2] A "global backup," also sometimes referred to as a "full backup," is a backup of every
    file on a computer's hard drive.  *See* Bryan Raffenberger, *Webster's New World Computer*
26  *Dictionary*, 155 (Wiley Publishing, Inc., 10th ed. 2003).  If a file was accessed as the result of
    a global backup, it would be unlikely that the file was intentionally accessed on that occasion.
27

28      [3] "Ethernet" refers to "a local area network hardware, communication, and cabling
    standard."  Raffenberger, *Webster's New World Computer Dictionary* at 133.  A "driver" is a
    program used to operate a specific peripheral device, such as a printer.  *Id.* at 119.

twenty-one of its files, and that Hawkins only wrote low level driver code.  Galligher testified

at trial that in his opinion, Coryell was the principal developer of Aegis.  Galligher also

opined that Aegis and PIX had a common ancestry, but he could not say with certainty that

Aegis was derived from PIX.

### ISSUES[4]

Hawkins asserts the following claims as grounds for federal habeas corpus relief:

(1) that he was denied his due process rights because the state penal statute under which he was convicted was unconstitutionally vague;

(2) that the trial court's admission of evidence of his prior misconduct regarding possession of other source code violated his due process rights;

(3) that the trial court's failure to give the jury a unanimity instruction violated his due process rights;

(4) that the trial court's admission of computer records that he contends were unreliable violated his due process rights;

(5) that the prosecution failed to disclose exculpatory evidence in violation of the Fifth and Fourteenth amendments;

(6) that trial counsel rendered ineffective assistance in violation of the Sixth Amendment.

### EXPANSION OF RECORD BEFORE THIS COURT

This case has a long history in this court.  Hawkins has submitted numerous

requests to expand the record in this case, to conduct additional discovery, and for

evidentiary hearings – some of which this court has granted and others which it has denied.

As a result, there have been three rounds of supplemental briefing, each including an

opening, opposition, and reply brief, for a total of nine supplemental briefs.

On May 3, 2004, Hawkins filed his traverse with this court, which included eight new

exhibits, not previously submitted to the state courts, and a request for an evidentiary

hearing on four of the six claims presented in his petition.  Those exhibits consisted

primarily of declarations of Hawkins' former colleagues and expert reports and opinions, as

---

[4]Hawkins raised issues 1-4 on direct appeal before the California appellate courts.  As a result, the California Court of Appeal addressed those issues in its written opinion issued June 5, 2002.  However, Hawkins raised issues 5-6 in habeas proceedings before the state appellate courts only.  Because the California courts issued postcard denials of the petition, there is no written state court decision regarding claims 5 and 6.

1  follows:

2      Exh. A.      Decl. of Jeffrey Hewitt

3      Exh. B       Decl. of Mike Kryss

4      Exh. C       Decl. of Chester Cuaresma

5      Exh D        Decl. of James Peterson

6      Exh. E       Decl. of Tina Singh

7      Exh. F       Decl. of Kevin Mitnick

8      Exh. G       Decl. of John Bartas

9      Exh. H       Decl. Timothy Pozar

10      The state subsequently objected to the new exhibits filed by Hawkins, and opposed

11  his request for an evidentiary hearing on the grounds that Hawkins failed to develop the

12  factual bases of his claims in state court and to avail himself of state court collateral

13  proceedings to develop the factual record.  On March 11, 2005, this court granted Hawkins'

14  request to expand the record to include the above eight exhibits with respect to claims five

15  and six *only*.  The court denied expansion of the record with respect to claims two and four,

16  though, and also denied Hawkins' request for an evidentiary hearing as to claims two and

17  four with prejudice.  It, however, denied Hawkins' request for an evidentiary hearing as to

18  claims five and six *without prejudice*, and ordered supplemental briefing on claims five and

19  six, incorporating the additional eight exhibits allowed into the record.  Hawkins filed his

20  opening supplemental brief on April 25, 2005, the state filed its supplemental opposition

21  brief on May 24, 2005, and Hawkins replied on June 7, 2005 ("1st supplemental briefs").

22      In addition to his 1st supplemental reply brief as to claims five and six, Hawkins also

23  filed that same day a renewed request for an evidentiary hearing as to claim five *only*, and

24  leave to conduct additional discovery regarding claim five *only* pursuant to Habeas Rule

25  6(a).  Specifically, Hawkins sought to depose three additional witnesses, including Mayes,

26  Foss, and Wu.  The state opposed Hawkins' request.  On August 30, 2005, this court

27  granted Hawkins' request for discovery, but again denied his request for an evidentiary

28  hearing as to claim five without prejudice.  The court ordered Hawkins to notify it when the

United States District Court
For the Northern District of California

1   depositions were complete.

2       On March 2, 2006, Hawkins notified the court that he had completed the depositions

3   of Mayes, Foss, and Wu.  The court again ordered the parties to submit supplemental

4   briefs as to claim five incorporating the additional discovery.  Hawkins submitted his

5   supplemental brief on April 3, 2006, and also filed under seal transcripts of the Wu, Mayes,

6   and Foss depositions.  The state filed its supplemental opposition, along with a

7   supplemental exhibit from state court prosecuting attorney, Frank Berry, on April 18, 2006.

8   Hawkins replied on April 24, 2006 ("2nd supplemental briefs").

9       Again, with his 3rd supplemental reply, Hawkins submitted another request for

10  additional discovery regarding claim five.  In this last request, Hawkins sought to depose

11  five additional witnesses, including state court prosecuting attorney Frank Berry and

12  investigator Michael Boggess, in addition to Cisco employees Richard Clark, Diane Olsen,

13  and Michael Volpi.  On June 6, 2006, the court granted in part and denied in part Hawkins'

14  request.  It allowed him to depose Boggess only.  The court also noted that it would

15  entertain no further requests for discovery and/or extensions given the delay in the case

16  already.  On August 7, 2006, Hawkins notified the court that Boggess' deposition was

17  complete.  He filed a third supplemental brief incorporating material from Boggess'

18  deposition on August 21, 2006; the state filed its 3rd supplemental opposition on August

19  28, 2006; and Hawkins replied on September 5, 2006 ("3rd supplemental briefs").

20                          **STANDARD OF REVIEW**

21      The petition in this case was filed after the effective date of the Antiterrorism and

22   Effective Death Penalty Act of 1996 (AEDPA), so the provisions of that act apply.  *See*

23  *Lindh v. Murphy*, 521 U.S. 320, 327 (1997).  Under the AEDPA, a district court may not

24  grant a petition challenging a state conviction or sentence on the basis of a claim that was

25  reviewed on the merits in state court unless the state court's adjudication of the claim: "(1)

26  resulted in a decision that was contrary to, or involved an unreasonable application of,

27  clearly established Federal law, as determined by the Supreme Court of the United States;

28  or (2) resulted in a decision that was based on an unreasonable determination of the facts

United States District Court

For the Northern District of California

1   in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

2        A state court decision is "contrary to" Supreme Court authority, falling within the first

3   clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

4   reached by [the Supreme] Court on a question of law or if the state court decides a case

5   differently than [the Supreme] Court has on a set of materially indistinguishable facts."

6   *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  "Clearly established Federal law" under

7   § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at

8   the time the state court renders its decision.  *Lockyer v. Andrade*, 538 U.S. 63, 71-72

9   (2003).  This "clearly established" law refers to the holdings, as opposed to the dicta, of

10  Supreme Court decisions as of the time of the relevant state court decision.  *Id.* at 71.

11       Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court

12  may grant the writ if the state court identifies the correct governing legal principle from the

13  Supreme Court's decisions but unreasonably applies that principle to the facts of the

14  petitioner's case.  *Id.* at 75.  However, this standard requires the state court decision to be

15  more than incorrect or erroneous.  *Id.*  For the federal court to grant habeas relief, the state

16  court's application of the Supreme Court authority must be objectively unreasonable.  *Id.*

17  The "objectively unreasonable" standard is different from the "clear error" standard in that

18  "the gloss of clear error fails to give proper deference to state courts by conflating error

19  (even clear error) with unreasonableness."  *Id.*; *see Clark v. Murphy*, 331 F.3d 1062, 1068

20  (9th Cir. 2003).  Therefore, it is not enough that a federal habeas court, in its independent

21  review of the legal question, is left with a firm conviction that the state court was erroneous.

22  Rather, the habeas court must conclude that the state court's application of federal law was

23  objectively unreasonable.  *Andrade,* 538 U.S. at 76*; Clark,* 331 F.3d at 1068.

24       However, when the state court decision does not articulate the rationale for its

25  determination or does not analyze the claim under federal constitutional law, a review of

26  that court's application of clearly established federal law is not possible.  *See Delgado v.*

27  *Lewis*, 223 F.3d 976, 981-81 (9th Cir. 2000); *see also* 2 J. Liebman & R. Hertz, *Federal*

28  *Habeas Corpus Practice and Procedure* § 32.2, at 1424-1426 & nn. 7-10 (4th ed. 2001).

**United States District Court**
For the Northern District of California

1   When confronted with such a decision, a federal court must conduct an independent review

2   of the record and the relevant federal law to determine whether the state court's decision

3   was contrary to, or involved an unreasonable application of, clearly established federal law.

4   *Delgado*, 223 F.3d at 982.

5           When a state court does not furnish a basis for its reasoning, we have no
            basis other than the record for knowing whether the state court correctly
6           identified the governing legal principle or was extending the principle into a
            new context... [A]lthough we cannot undertake our review by analyzing the
7           basis for the state court's decision, we can view it through the 'objectively
            reasonable' lens ground by *Williams* [*v. Taylor*, 529 U.S. 362 (2000)]...
8           Federal habeas review is not de novo when the state court does not supply
            reasoning for its decision, but an independent review of the record is required
9           to determine whether the state court clearly erred in its application of
            controlling federal law.... Only by that examination may we determine whether
10          the state court's decision was objectively reasonable.

11  *Id.*

12          As for state court findings of fact, under § 2254(d)(2), a federal court may not grant a

13  habeas petition by a state prisoner unless the adjudication of a claim on the merits by a

14  state court resulted in a decision that was based on an unreasonable determination of the

15  facts in light of the evidence presented in the state court proceeding.  28 U.S.C.

16  § 2254(d)(2).  The "clearly erroneous" standard of unreasonableness that applies in

17  determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in

18  determining the "unreasonable determination of facts in light of the evidence" under

19  § 2254(d)(2).  *See Torres v. Prunty*, 223 F.3d 1103, 1107-1108 (9th Cir. 2000).  To grant

20  relief under § 2254(d)(2), a federal court must be "left with a firm conviction that the

21  determination made by the state court was wrong and that the one [petitioner] urges was

22  correct."  *Id.* at 1108.

                              **DISCUSSION**

23  **I.    The Statute is Not Unconstitutionally Vague**

24          Hawkins argues that California Penal Code § 502(c)(2) is unconstitutional on its

25  face, because it is so vague that it cannot provide a clear basis for criminal prosecution.

26  Section 502(c)(2), under which Hawkins was convicted, provides that a person who

27  commits the following act is guilty of a public offense:

28          "Knowingly accesses and without permission takes, copies or makes use of

                                        11

United States District Court

For the Northern District of California

1   any data from a computer, computer system, or computer network, or takes
2   or copies any supporting documentation, whether existing or residing internal
    or external to a computer, computer system, or computer network."

3   1989 Cal. Legis. Serv. 1357 § 1 (West).[5]  Hawkins' vagueness challenge is directed at the

4   expanded statutory exemption under former subdivisions (i)(2) and (j), which is now found

5   in current subdivisions (h)(2) and (i).[6]  These subdivisions created a specific exemption for

6   acts in violation of § 502(c)(3) (unauthorized use of a computer), even when such acts

7   incidentally violated § 502(c)(2), as long as they did not cause injury or use computer

8   services with a value of more than $100.  1989 Cal. Legis. Serv. 1357 § 1.

9        To avoid unconstitutional vagueness, a statute or ordinance must define the offense

10  with sufficient definiteness that ordinary people can understand what conduct is prohibited,

11  and must establish standards to permit police to enforce the law in a non-arbitrary,

12  non-discriminatory manner.  *See Vlasak v. Superior Court of California*, 329 F.3d 683,

13  688-89 (9th Cir. 2003); *Panther v. Hames*, 991 F.2d 576, 578 (9th Cir. 1993); *United States*

14  *v. Brice*, 926 F.2d 925, 930 (9th Cir. 1991); *see also Coates v. City of Cincinnati*, 402 U.S.

15  611, 614 (1971) (statute deemed void for vagueness if it fails to give adequate notice to

16  people of ordinary intelligence of prohibited conduct).  Hawkins claims that a reasonable

17  person would have been unable to discern whether his use of a computer "incidentally

18  violated" § 502(c)(2), such that it would fall under the statutory exemption.  He argues

19  further that the statute provided no rational basis by which a prosecutor could have

20  determined what amounted to an incidental violation of another section of the statute.

21       The state appellate court concluded that § 502(c)(2) was sufficiently clear to survive

22  constitutional scrutiny.  It found that the exemptions contained in former subdivisions (i)(2)

23  and (j) reflected the Legislature's determination that certain violations of §§ 502(c)(2) and

24  _____

25  [5] This version of § 502(c)(2), which existed at the time of the events leading to Hawkins'
    conviction, is identical to the current version of the statute.  *See* Cal. Pen. Code. § 502(c)(2).
26  Hawkins was charged with, and convicted of, violating § 502(c)(2) between November 1, 1995
    and August 1, 1996.  The statute was amended in 1998, 1999, and 2000.

27  [6] The change in the subdivision letters is a result of the deletion of former subdivision
    (h), which is not relevant to the present petition.  Current subdivision (h)(2) is nearly identical
28  to former subdivision (i)(2), and all differences are minor and do not affect Hawkins' claim.  The
    language of current subdivision (i) is identical to that of former subdivision (j).

**United States District Court**
For the Northern District of California

1    (c)(3) were so trivial as not to warrant criminal prosecution.  With respect to § 502(c)(2), the

2    state court found that the relevant exemption was meant to apply to a person primarily

3    engaged in trivial, unauthorized use of an employer's computer services, even if the use

4    incidentally involved taking, copying, or using data from a computer.  Under this

5    construction, the state court was satisfied that the average person would have been able to

6    discern whether his or her conduct was prohibited under the statute.

7          Hawkins suggests that § 502(c)(2) could easily have been violated by, for example,

8    an unwitting computer user who pushed the wrong button, causing information to be

9    displayed or copied.  However, Hawkins' hypothetical has no bearing on his right to federal

10   habeas relief, because unless the First Amendment is implicated, a vagueness challenge

11   may not rest on arguments that the law is vague in its hypothetical applications, but must

12   show that the law is vague as applied to the facts of the case at hand.  *See Village of*

13   *Hoffman Estates v. Flipside*, 455 U.S. 489, 495 (1982).  In *Hoffman Estates*, the law in

14   question was an ordinance that required businesses to obtain a license to sell any items

15   "designed or marketed for use with illegal cannabis or drugs."  *Id.* at 491.  The Supreme

16   Court upheld the ordinance, dismissing the appellate court's speculative concern that the

17   "designed ... for use" language might be unclear in some of its applications to hypothetical

18   parties.  *Id.* at 495.  The Court found that "designed ... for use" clearly covered at least

19   some of the items that Flipside sold, and therefore the ordinance was not unconstitutionally

20   vague as applied to the facts of the case.  *Id.* at 502.

21         Just as it was inappropriate in *Hoffman Estates* to consider a speculative concern as

22   to whether certain parties would be covered by the ordinance, it is also inappropriate here

23   to consider a hypothetical situation where a party might inadvertently push a computer

24   button that results in copying information.  *See id.* at 495, 502.  Hawkins was not convicted

25   based on an inadvertent act, but was instead convicted of knowingly accessing and taking

26   source code from Cisco.  Therefore, the relevant question is whether § 502(c)(2) gave fair

27   notice to a person of ordinary intelligence that it would apply to one who knowingly

28   accessed and took source code from his former employer's computer system.  *See United*

13

United States District Court

For the Northern District of California

1   *States v. Johnson*, 130 F.3d 1352, 1354 (9th Cir. 1997) (in an appeal of a sentence for

2   bank fraud, where defendant embezzled $1,468,205.86, the vagueness question was

3   whether the guidelines "give fair notice to a person of ordinary intelligence that [they] would

4   apply to one who defrauds a bank of more than $1.4 million").

5          As the state appellate court correctly noted, the exemption in § 502, former

6   subdivisions (i)(2) and (j), exempted a violation of § 502(c)(2) from prosecution only if the

7   acts constituting the violation were incidental to a primary objective of de minimis

8   unauthorized use of a computer.  This court agrees with the state court that a person of

9   ordinary intelligence would have been on notice that the exemption did not apply when

10  accessing and taking data from a computer, rather than merely using the computer, was

11  one's primary objective.  The state court was reasonable in finding that § 502(c)(2) met the

12  constitutional certainty requirement, because, as applied to the facts of this case, its

13  language conveyed sufficiently definite warning as to the proscribed conduct when

14  measured by common understanding and practices.  *See Panther*, 991 F.2d at 578 (finding

15  that the terms "substantial risk" and "gross deviation" were "commonly known and

16  understood by the public," and were thus sufficiently certain).  In light of the above, the

17  California Court of Appeal's decision was not contrary to, nor did it involve an unreasonable

18  application of, clearly established Supreme Court precedent.

19  **II.     The Admission of Evidence of Hawkins' Prior Misconduct in Possessing
            Source Code Did Not Violate his Due Process Rights**

20

21          Hawkins argues that his due process rights were violated by the trial court's

22  admission of Foss' testimony regarding his alleged observation of Sun source code on

23  Hawkins' computer, while they were working on a project at Cisco in 1996.  Hawkins claims

24  that the prosecution produced insufficient evidence to show that the code Foss observed

25  on Hawkins' computer was proprietary information of Sun Microsystems, thus making the

26  evidence irrelevant and prejudicial.[7]

_____

27          [7]Foss testified that while working on a stock quote program at Cisco, he observed on
    Hawkins' computer "the source code for Sun Microsystems, Sun o.s. 413, I think it was."  He
28  testified further that he observed headers on the source code files, which identified the code
    as belonging to Sun.

1     A state court's evidentiary ruling is not subject to federal habeas review unless the

2  ruling was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *See*

3  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley v. Sumner*, 784 F.2d 984, 990

4  (9th Cir.), *cert. denied*, 479 U.S. 839 (1986).  Only if there are no permissible inferences a

5  jury may draw from the evidence can its admission violate due process.  *See Jammal v.*

6  *Van de Kamp*, 926 F.2d 918, 919-920 (9th Cir. 1991) (rejecting defendant's objection to the

7  admission of evidence that he was apprehended driving a car with $135,000 in the trunk,

8  the court found that there were rational inferences the jury could have drawn from the

9  challenged evidence: "[t]hat defendant was running around with large wads of cash in his

10  trunk ... makes it more likely that he had also put the pile of cash in his trunk on the earlier

11  occasion, when it was found with the drugs.").  In *Gordon v. Duran*, 895 F.2d 610, 613 (9th

12  Cir.1990), the court held that admission of prior misconduct evidence did not violate due

13  process where the trial court gave a limiting instruction to jury, and evidence was relevant

14  to defendant's intent.

15     In the present case, the trial court admitted Foss' testimony regarding Hawkins' prior

16  possession of Sun source code for the limited purpose of its relevance to Hawkins' intent in

17  later taking and copying the PIX source code.  The California Court of Appeal upheld the

18  trial court's ruling, finding that the prior misconduct evidence was admissible for its

19  probative value as to intent.  The state appellate court also agreed with the trial court that

20  Foss' testimony provided an adequate basis for determining that the source code he

21  observed on Hawkins' computer was proprietary.  The state appellate also noted Foss'

22  testimony that he cautioned Hawkins in March 1996 about possessing source code from

23  Sun while working at Cisco, which further weighed against Hawkins' assertion that his later

24  possession of PIX source code was inadvertent.

25     Here, the state appellate court's decision was not unreasonable because the trial

26  court reduced any potential prejudicial effect of the prior misconduct evidence by providing

27  the jury with an instruction regarding the limited purpose of the evidence.  The trial court

28  instructed the jury that the prior misconduct evidence "may not be considered by you to

**United States District Court**

For the Northern District of California

1    prove that the defendant is a person of bad character or that he has a disposition to commit

2    crimes."  The jury was instructed to use it only as evidence of "a characteristic, method,

3    plan or scheme ... which would further tend to show the existence of the intent which is a

4    necessary element of the crime charged."

5         As in *Gordon*, the evidence of Hawkins' prior possession of Sun source code was

6    probative of the issue of intent, and the trial court issued a limiting instruction prohibiting the

7    jury from considering the evidence to show Hawkins' bad character or predisposition.

8    Under these circumstances, Hawkins' federal due process right to a fair trial was not

9    violated by the admission of evidence of his alleged prior misconduct.  *See Gordon*, 895

10   F.2d at 613.  The state appellate court's decision therefore was not contrary to, nor did it

11   involve an unreasonable application of, clearly established Supreme Court precedent.

12

13   **III.    The Trial Court's Failure to Give the Jury a Unanimity Instruction Did Not
             Violate Hawkins' Due Process Rights**

14        Hawkins argues that the trial court erred by failing to give the jury a unanimity

15   instruction, because the prosecutor relied on two separate factual scenarios in proving his

16   guilt under § 502(c)(2).  First, Hawkins contends that the prosecution relied on evidence

17   indicating that the source code was found on Hawkins' personal computer to show that

18   Hawkins intentionally copied the PIX source code and took it from Cisco.  Second, Hawkins

19   argues that the prosecution relied on the UNIX access dates to show that he accessed and

20   used the source code to create his own product.

21        A state trial court's failure to give an instruction does not alone raise a ground

22   cognizable in a federal habeas corpus proceeding.  *See Dunckhurst v. Deeds*, 859 F.2d

23   110, 114 (9th Cir. 1988).  The error must so infect the trial that the defendant was deprived

24   of the fair trial guaranteed by the Fourteenth Amendment.  *See id.*  Whether a constitutional

25   violation has occurred will depend upon the evidence in the case and the overall

26   instructions given to the jury.  *See Duckett v. Godinez,* 67 F.3d 734, 745 (9th Cir. 1995).

27   "An omission, or an incomplete instruction, is less likely to be prejudicial than a

28   misstatement of the law."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  Therefore,

**United States District Court**
For the Northern District of California

1  where the alleged error is the failure to give an instruction, the habeas petitioner's burden is

2  especially heavy.  *See id.*

3        The state appellate court found that a unanimity instruction was not required

4  because, based on the evidence presented and the jury instructions given at trial, there

5  was no reasonable possibility that the jury disagreed as to which acts constituted the

6  charged offense of accessing and taking data from a computer system.  The state court

7  noted that the prosecutor repeatedly argued to the jury that the charged crime was

8  completed when Hawkins knowingly copied the PIX source code files and installed them on

9  his personal computer.  The state appellate court thus reasoned that the prosecutor

10  thereby relied only on one theory of liability –  that Hawkins copied and took the PIX source

11  code before he left Cisco.  Because only one theory was presented to the jury, the state

12  court found that there was no significant risk that jurors convicted Hawkins based on

13  different facts.  *See United States v. Pirro*, 104 F.3d 297, 300 (9th Cir. 1996).   It further

14  noted that the jury was instructed that Hawkins was charged with violating

15  § 502(c)(2) between November 1, 1995 and August 16, 1996, thus leaving the May 1997

16  access date outside of the time frame for the charged crime.

17        Given the evidence presented at trial and the overall instructions given to the jury,

18  the state court was reasonable in holding that the absence of a unanimity instruction at trial

19  did not render Hawkins' trial fundamentally unfair.  *See U.S. v. Dees*, 34 F.3d 838, 842 (9th

20  Cir. 1994) (finding that trial court's instruction on intent to defraud obviated the need for the

21  requested good faith instruction).  *Id.*  The state court's decision was thus not contrary to,

22  nor was it an unreasonable application of, clearly established Supreme Court precedent.

23

24

25

26  **IV.    The Admission of Evidence of Computer Access Dates Did Not Violate
        Hawkins' Due Process Rights**

27        Hawkins also argues that his due process rights were violated by the trial court's

28  admission of unreliable computer-generated records of file access dates.  The trial court

**United States District Court**
For the Northern District of California

admitted the computer-generated records over Hawkins' hearsay objection, based on the fact that the records were being offered for the truth of the matter asserted, that there was no applicable hearsay exception, and that the printouts of the access dates did not qualify as business records under Evidence Code § 1271.  Hawkins additionally argued on appeal that the computer access date evidence was so unreliable that it compromised any chance of a fair trial.

In upholding the admission of the evidence, the California Court of Appeal was persuaded by a Louisiana case, which held that printouts of the results of a computer's internal operations are not hearsay, because they are not statements, nor are they representations of statements placed into the computer by out of court declarants.  *State v. Armstead*, 432 So.2d 837, 840 (La. 1983).  Under *Armstead*, the test for admissibility of a printout reflecting a computer's internal operations is not whether the printout was made in the regular course of business, but whether the computer was functioning properly at the time the printout was produced.  *Id.*  Thus, the California Court of Appeal found that the trial court did not err in rejecting Hawkins' hearsay objection because there was some evidence indicating that the computer was functioning properly at the time it produced the records.

As noted, the state court's evidentiary ruling is not subject to federal habeas review unless the ruling was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *See Walters v. Maass*, 45 F.3d at 1357; *Colley*, 784 F.2d at 990.

Here, the state appellate court's decision was not arbitrary or prejudicial because the *Armstead* decision, upon which it relied, is not contrary to clearly established federal law, as determined by the Supreme Court of the United States.  In fact, no clearly established Supreme Court precedent speaks to whether computer printouts are inadmissible hearsay, and the lower courts have taken a variety of positions on the issue.  Some courts consider all computer records hearsay, admissible only under the business records or public records exceptions.  Adam Wolfson, *Electronic Fingerprints*, 104 Mich. L. Rev. 151, 155 (2005).

Other courts distinguish between computer-stored records and computer-generated records.  These courts, like the *Armstead* court, have held that computer-generated records

**United States District Court**
For the Northern District of California

1  are not hearsay because they are independent of human observations and reporting.  *Id.* at

2  157-58; *see also, e.g., United States v. Khorozhian*, 333 F.3d 498, 505 (3d Cir. 2003)

3  (citing Mueller & Kirkpatrick, *Federal Evidence*, § 380, at 65 (2d ed. 1994)) (holding that a

4  header generated by a fax machine was not hearsay because "nothing 'said' by a machine

5  . . . is hearsay");  *United States v. Hamilton*, 413 F.3d 1138, 1142 (10th Cir. 2005) (holding

6  that header information accompanying pornographic images uploaded to the internet were

7  not hearsay).  These courts have reasoned that because the computer instantaneously

8  generated the header information without the assistance of a person, there was neither a

9  "statement" nor a "declarant."  *Hamilton*, 413 F.3d at 1142.

10      The Third and Tenth Circuit approaches are also endorsed by evidentiary treatises.

11  *See McCormick On Evidence,* § 294(b), at 447 (John W. Strong ed., 5th ed. 1999)

12  (computer-generated records should not be considered hearsay because "such records are

13  not the counterpart of a statement by a human declarant").  Like *Armstead,* the treatises

14  advise that courts should determine the admissibility of these records based on the

15  reliability and accuracy of the process involved.  *Id.; see also* Mueller & Kirkpatrick, *Federal*

16  *Evidence*, § 380, at 65 (machine-generated information that is mainly a result of

17  "mechanical measurement or manipulation of data by well-accepted scientific or

18  mathematical techniques" is admissible if the proper foundation establishing reliability

19  exists).

20      The parties did not cite to any, and the court was unable to find any Ninth Circuit

21  cases directly discussing the applicability of the hearsay rule to computer printouts.

22  Instead, most of the Ninth Circuit authority concerns computer printouts in relation to the

23  business records and public records exceptions to the hearsay rule.

24      The closest Ninth Circuit decision appears to *United States v. Cowley*, in which the

25  court held that a machine-generated postmark on a letter was hearsay that may be

26  admissible under an exception to the hearsay rule.  720 F.2d 1037, 1044-45 (9th Cir.

27  1983).  The court determined that the postmark was hearsay because a postal worker was

28  responsible for setting and causing letters to pass through the machine that affixed the

1    postmark. *Id.* at 1044.  The postmark, according to the court, was "the postal official's

2    written assertion that the letter passed through his hands at the . . . post office on a

3    particular day." *Id.*  Even though the postmark was hearsay, the court noted that the

4    postmark was very reliable due to the unlikelihood of misperception or fabrication by the

5    postal worker. *Id.* at 1044-45.  The court held that the watermark's trustworthiness made it

6    an ideal candidate for the residual hearsay exception, Rule 803(24) [now Rule 807]. *Id.* at

7    1045.  However, in *Cowley*, the watermark was deemed inadmissible hearsay because the

8    party seeking to admit the watermark did not comply with Rule 807's notice requirement.

9    *Id.*

10    Under the Ninth Circuit's reasoning in *Cowley*, the computer printouts here would not

11    be considered hearsay because a human was not responsible for setting and coordinating

12    the computer's recording of access dates.  Rather, the access dates were completely

13    computer-generated with no human input.  Even if the printouts were hearsay, under

14    *Cowley,* they would likely fall under the residual hearsay exception due to their high degree

15    of reliability.

16    In light of the above, the California Court of Appeal's decision was not contrary to,

17    nor was it an unreasonable application of, clearly established Supreme Court precedent.

18    **V.**    **Hawkins is not Entitled to Relief based on the Alleged *Brady* Violation**

19    Hawkins also claims that his conviction was tainted because the prosecution failed to

20    disclose exculpatory evidence in violation of the Fifth and Fourteenth Amendments.  He

21    contends that the prosecution had knowledge of financial relationships between certain

22    witnesses, yet failed to disclose this information to the defense.

23    Specifically, Hawkins argues that the jury was entitled to consider the ongoing

24    financial relationships between witnesses Wu, Mayes, and Foss in assessing the

25    prosecution witnesses' credibility.  He suggests that the jury may have concluded that the

26    witnesses had a strong bias against him and motive to lie.  Hawkins contends that

27    investigators from the Santa Clara County District Attorney's office knew of the financial

28    relationships between Mayes, Wu, and Foss at the time of the April 2000 trial, but that they

1   failed to disclose such information to the defense.

2       **A.      Discovery in this Case**

3       On August 30, 2005, this court granted Hawkins' request to depose Foss, Mayes,

4   and Wu.  Both Foss' and Wu's depositions were conducted on February 6, 2006.  Mayes

5   was deposed on February 28, 2006.   Subsequently, on June 6, 2006, the court also

6   granted Hawkins' request to depose state investigator Michael Boggess regarding his

7   knowledge of the witnesses' alleged financial relationships.[8]

8       The discovery in this case reveals that the personal and financial relationships

9   between Foss, Mayes, and Wu date back to 1994.  The three men were all part of the start-

10  up network technology company NTI, which was formed in late 1994.  John Mayes, founder

11  of NTI, and all other NTI employees, shared responsibilities as computer programmers

12  focused on designing internet network accessibility programs.

13      Hawkins began his employment with NTI shortly before Cisco's acquisition of NTI in

14  late 1995.  Mayes, Foss, Wu, and Hawkins all subsequently became employees of Cisco.

15  The four men all benefitted financially from Cisco's purchase of NTI.

16      Wu later resigned from his position at Cisco and invested in a new company founded

17  by Mayes in April 1999, Open Range Ventures.  Foss also left Cisco, in November 1999,

18  and founded a new company, CAW Networks.  Wu also invested in CAW, in April 2000,

19  and later received shares in CAW.  He became employed by CAW sometime between

20  2001 and 2002.  Mayes' newly formed Open Range Ventures invested in CAW in

21  December 1999.

22      As noted, in July 2006, Hawkins deposed Investigator Boggess regarding his

23  knowledge of the financial relationships between Mayes, Foss, and Wu.  Boggess began

24  working as an investigator for the Santa Clara County District Attorney's office in

25  September 1998, and was assigned to Hawkins' case.  He received his assignments from

26  ────────────────

27      [8]Hawkins also sought to depose prosecuting attorney, Frank Berry.  In conjunction with
    that request, the state submitted a declaration from Berry in which Berry attested that he was
28  unaware of the witnesses' overlapping financial interests.  Accordingly, this court concluded
    that Hawkins had not shown good cause to depose Berry, and denied the request.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    prosecutor Frank Berry, who was handling the case.  Boggess was present at two joint

2    interviews that were conducted with the witnesses.  On March 17, 1999, Boggess

3    conducted a joint interview, which included both Foss and Wu.  Prosecutor Frank Berry

4    conducted the second joint interview of Mayes, Foss, and Wu on September 9, 1999, and

5    investigator Boggess took notes.

6         During his July 2006 deposition, Boggess relied primarily on his notes from the

7    September 1999 meeting because he had little specific recollection regarding the meeting.

8    *See* Exh. A, Pet. 3rd Suppl. Brief, Depo. Exh. 3.   Boggess' notes showed that some

9    financial information regarding Wu was revealed at the September 1999 meeting; however,

10   Boggess' notes contained no information regarding the financial relationships between

11   Mayes, Foss, and Wu, and Boggess could not recall whether such information was

12   discussed during the course of the meeting.  *Id.* at 37, 43.  Boggess also could not recall

13   any conversations that he had with prosecutor Berry regarding any such information.  *Id.* at

14   34.

15        **B.    Legal Standard**

16        "[T]he suppression by the prosecution of evidence favorable to an accused upon

17   request violates due process where the evidence is material either to guilt or to

18   punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v.*

19   *Maryland*, 373 U.S. 83, 87 (1963).  A *Brady* claim has three components: "[t]he evidence

20   must be favorable to the accused, either because it is exculpatory, or because it is

21   impeaching; that evidence must have been suppressed by the state, either wilfully or

22   inadvertently; and prejudice must have ensued."  *Strickler v. Green*, 527 U.S. 263, 281-282

23   (1999); *see Banks v. Dretke*, 540 U.S. 668, 691 (2004).  Once constitutional error has been

24   found under *Brady*, it cannot subsequently be found harmless; the conviction must be set

25   aside.  *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

26        For the first component of the claim, evidence is exculpatory if it is "merely favorable

27   to the accused."  *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004).  The evidence does not

28   have to affirmatively prove the defendant innocent; but must instead satisfy the "low,

22

United States District Court

For the Northern District of California

favorable to the accused standard." *Id.* (quotation marks omitted).  Both exculpatory and impeachment evidence may be favorable to the accused under the *Brady* standard.  *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Benn v. Lambert*, 283 F.3d 1040, 1052 (9th Cir. 2002).  In addition, exculpatory evidence includes evidence whose value allows a defendant to attack the thoroughness and good faith of an investigation, albeit typically in cases where the suppressed evidence is needed to impeach a government witness. *See Kyles*, 514 U.S. at 445; *see, e.g., Bagley*, 473 U.S. at 676-677 (government suppressed evidence that witness received a promise that he would not be prosecuted in exchange for testimony) ; *Benn*, 283 F.3d at 1053 (state suppressed impeachment evidence of prosecution witness); *Paradis v. Arave*, 240 F.3d 1169, 1175 (9th Cir. 2001) (state suppressed inadmissible handwritten notes that could be used to impeach expert opinion).

For the second component, the state has no good faith or inadvertence defense to a *Brady* claim; whether nondisclosure was negligent or by design, it is the responsibility of the prosecutor.  *Gantt*, 389 F.3d at 912.  In addition, the prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf.  *See Kyles*, 514 U.S. at 437-438.  The obligation to disclose exculpatory evidence under *Brady* and its progeny "is the obligation of the government, not just the obligation of the prosecutor." *United States v. Blanco*, 392 F.3d 382, 393 (9th Cir. 2004).  However, there is no suppression where the government discloses all information necessary for the defense to discover alleged *Brady* material on its own.  *United States v. Bracy*, 67 F.3d 1421, 1428-29 (9th Cir. 1995).  Nonetheless, the fact that the defense failed to discover favorable evidence when it could or should have done so does not mean that such evidence has not been "suppressed."  *Gantt*, 389 F.3d at 912-913.

The terms "material" and "prejudicial" are used interchangeably to describe the third component.  *Bailey v. Rae*, 339 F.3d 1107, 1116 n. 6 (9th Cir. 2003);  *see also Benn*, 283 F.3d at 1053 n. 9 ("Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is 'material'").  "Prejudice" and "materiality" are interchangeable because the *Brady* standard for materiality is the same as the standard for determining prejudice in ineffective

United States District Court

For the Northern District of California

1   assistance of counsel claims.  *See Kyles*, 514 U.S. at 434 (court adopted "reasonable

2   probability" standard for *Brady* claims from *Strickland v. Washington*, 466 U.S. 668, 694

3   (1984)); *Bagley*, 473 U.S. at 682 (*Strickland* formulation is sufficiently flexible to cover

4   cases of prosecutorial failure to disclose favorable evidence); *Strickland*, 466 U.S. at 694

5   (appropriate standard to determine ineffective assistance of counsel prejudice is rooted in

6   the test for materiality of exculpatory information not disclosed to the defense); *see also*

7   *Downs v. Hoyt*, 232 F.3d 1031, 1038 (9th Cir. 2000) (citing *Strickland* and *Kyles* for the

8   ineffective assistance of counsel "reasonable probability" standard); *Benn*, 283 F.3d at

9   1053 (*Brady* claim evaluated using the same standard as ineffective assistance of counsel

10  claims).

11          The "touchstone of materiality is a 'reasonable probability' of a different result."

12  *Kyles*, 514 U.S. 419, 434 (1995).  This reasonable probability is "shown when the

13  government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"

14  *Id.* (quoting *Bagley*, 473 U.S. at 678).  Thus, "[a] showing of materiality does not require

15  demonstration by a preponderance that disclosure of the suppressed evidence would have

16  resulted ultimately in the defendant's acquittal," but must only establish that "the favorable

17  evidence could reasonably be taken to put the whole case in such a different light as to

18  undermine confidence in the verdict." *Kyles,* 514 U.S. at 434-435; *see also United States*

19  *v. Golb*, 69 F.3d 1417, 1430 (9th Cir. 1995) (the ultimate question is whether there is a

20  reasonable probability that, had the evidence been disclosed, the result of the proceeding

21  would have been different such that confidence in outcome is undermined); *Bailey*, 339

22  F.3d at 1118 (suppression of "linchpin" evidence left little confidence in outcome of trial).

23  The ultimate question for materiality is thus whether "disclosure of the suppressed evidence

24  to competent counsel would have made a different result reasonably probable." *Kyles*, 514

25  U.S. at 441.

26          Whether a "reasonable probability" exists may not be based on mere speculation

27  without adequate support.  *See Wood v. Bartholomew,* 516 U.S. 1, 6-8 (1995); *see also*

28  *Downs*, 232 F.3d at 1037 (rejecting as speculative an argument that withheld

United States District Court

For the Northern District of California

material–namely, police leads, including pictures and names of suspects–might have led to some admissible evidence that might have been sufficiently favorable to meet the *Brady* standard).

A determination of materiality under the *Brady* standard requires the evidence to be considered collectively.  *Kyles,* 514 U.S. at 434.  In addition, the materiality of the suppressed evidence is considered with the evidence admitted at trial.  *See United States v. Ross*, 372 F.3d 1097, 1107-1108 (9th Cir. 2004); *see also United States v. Agurs*, 427 U.S. 97, 112 (1976) (materiality of suppressed evidence must be evaluated in the context of the entire record).  The materiality of suppressed evidence requires the court to gauge the collective impact of the withheld evidence in terms of the strength of the prosecution's case.  *See Barker v. Fleming*, 423 F.3d 1085, 1100 (9th Cir. 2005).   Thus, to determine materiality, the exculpatory evidence must be considered with the evidence that was actually considered at trial to determine whether or not the trial, in the absence of the suppressed evidence, resulted in a verdict "worthy of confidence."  *Kyles*, 514 U.S. at 434.

### C.    Analysis

Hawkins argues that at the time of trial, the prosecution knew that the three witnesses had close financial relationships, and failed to disclose that information to the defense.  He asserts that the prosecution relied heavily on Foss' testimony regarding his alleged prior possession of Sun source code to show that he violated § 502(c)(2).  According to Hawkins, because this prior act evidence was a critical part of the prosecution's case, there is a reasonable probability that the result of the trial would have been different had the jury known of the continuing financial relationships between the witnesses.

The state, on the other hand, argues that there is no evidence of prosecutorial misconduct  because neither the state investigative team nor the prosecution had any knowledge of the financial relationships between Wu, Mayes, and Foss.  The state argues further that even if the prosecution had known of financial relationships between the witnesses, Hawkins cannot show that he consequentially suffered any prejudice from the

United States District Court

For the Northern District of California

1   alleged nondisclosure.  In support, it contends that Hawkins has not shown that the

2   allegedly undisclosed evidence was material.  It claims that the jury was aware of prior

3   financial and professional relationships between Mayes, Foss and Wu, and that each of

4   them had a substantial financial stake in Cisco.  It also counters that Foss' testimony was

5   not critical to the prosecution's case, because the prosecution presented overwhelming

6   evidence that Hawkins did not inadvertently copy the PIX source code.

7         In his supplemental brief following Boggess' deposition, Hawkins concedes that he

8   is unable to prove "beyond a reasonable doubt," that the prosecution was aware of the

9   alleged financial relationships between the three witnesses.  *See* 3rd Suppl. Reply.

10  Nevertheless, he argues (without citation) that, for a *Brady* violation, he need "only show by

11  a preponderance of the evidence that the information was known to some member of law

12  enforcement."  He asserts that the prosecution's lack of recall cannot defeat his claim.

13  Hawkins implies that the court may infer that the prosecution had knowledge of the

14  witnesses' financial relationships based on: (1) the fact that some financial information was

15  discussed at the 1999 meetings; (2) Foss' critical role in the prosecution's case; and (3) the

16  fact that Foss did not disclose Hawkins' alleged admission regarding the Sun source code

17  until after the first trial in 1999.

18        Even if this court were to assume that Hawkins has satisfied the first prong of the

19  *Brady* test, and has demonstrated the existence of evidence of ongoing financial

20  relationships between Wu, Foss, and Mayes that would have been favorable to the

21  defense, his claim nevertheless fails because he has not demonstrated, even by a

22  preponderance of the evidence:  (1) that the evidence was suppressed by the state, either

23  willfully or inadvertently; and (2) that prejudice ensued.

24                    **1.      Prosecution's Knowledge of Financial Relationships**

25        Prior to Boggess' deposition, Hawkins argued that during the September 9, 1999

26  meeting, information regarding the witnesses' financial relationships, particularly CAW

27  investments, was discussed with the prosecution.  Specifically, Hawkins noted evidence

28

**United States District Court**
For the Northern District of California

1  from the September 1999 meeting regarding Wu and shares in a company.[9]

2  However, contrary to Hawkins' suggestion, the expanded record reveals that Foss'

3  business venture, CAW, was not formed until November 1999, two months after the

4  September 9, 1999 meeting that took place at Cisco between Mayes, Foss, Clark, Olsen,

5  Wu, Boggess, and Berry.  Foss Depo. at 7-8.  The record further demonstrates that Mayes

6  invested in CAW on December 17, 1999, *see* Mayes Depo. at 10-11, and that Wu did not

7  invest in CAW until April 2000.  Wu Depo. at 12, 14. Thus, it would have been impossible

8  for Wu, Foss, and Mayes to relate to the authorities any current investment relationships

9  that they had at the time of their joint interviews.

10  It is clear that the three witnesses were all involved in Mayes' start-up company, NTI,

11  and were consequentially employed by Cisco once it purchased NTI.  There is no dispute

12  as to the common employment history that the three witnesses share.  There is also no

13  dispute that this shared history has resulted in common financial interests and comradery

14  among them.

15  However, the expanded record, which includes the depositions of Wu, Mayes, Foss,

16  and Boggess, along with the supplemental declaration from prosecutor Berry, *does not*

17  demonstrate that the district attorney investigators and prosecutors had any knowledge of

18  financial relationships between the three witnesses.  Moreover, there is no record evidence

19  that the prosecution made any attempt to analyze or compare Wu's shares or investments

20  in any company. This is also the case with Mayes and Foss.  Petitioner's Supp Brief Re

21  Claim 5 (Exhibit B to Barton Declaration).  Aside from some very scant notes from the

22  September 1999 meeting, referred to above, the record is void of any revelations made by

23  Wu, Mayes or Foss regarding any financial or investment relationships they shared.

24  Because there is no evidence that the prosecution was aware, or should have been

25  aware, of any ongoing financial relationships between the witnesses prior to petitioner's

---

26

27  [9]  The notes state "Wu - 3000 shares - 2000 shares - $8-9 million," yet there is no

28  further notation explaining what company the shares were in or whether anyone else present at the 9/19/99 investigative meeting made any similar investment. Petitioner's Supp Brief Re Claim 5 (Exhibit B to Barton Declaration).

United States District Court

For the Northern District of California

trial, Hawkins' *Brady* claim fails.

        **2.**      **Even if the Prosecution was Aware of the Financial Relationships among Witnesses, Hawkins has not Demonstrated Prejudice**[10]

      Nevertheless, even if the court were to find that the prosecution was aware of ongoing financial relationships between the witnesses, Hawkins' *Brady* claim fails because he cannot demonstrate prejudice.

      During the trial, the jury learned of Foss', Mayes', and Wu's common backgrounds and close friendships.  Record Exh. at 2A at 94, 101, 108, 120, 124, 128; Exh. 2B at 317, 319-320, 342, 387; Exh. 2C at 436, 448, 462.  From trial testimony, the jury specifically learned about the close-knit group of employees who worked for the start-up company NTI. Record Exh. 2A at 100-102, 105, 107-109, 111, 128; Exh. 2B at 317-320, 342, 387; Exh. 2C at 436, 448, 462.  It also became aware of the fact that the men were more than just co-workers, as they all made significant sacrifices in the best interest of Mayes' company. Although Mayes funded NTI with his own money, he rewarded the collective efforts of the NTI team by giving everyone stock options in the company.  Record Exh. 2A at 97, 100, 105, 109, 111.  When NTI was acquired by Cisco, Wu, Mayes, and Foss all realized substantial financial gain as a result.  Record Exh. 2A at 118; Exh. 2B at 317; Exh. 2C at 436.  Additionally, during the acquisition talks with Cisco, Mayes demonstrated his appreciation and fondness of his employees when he insisted that Foss and Wu retain their jobs once NTI was acquired.  Record Exh. 2A at 120, 124, 126; Exh. 2B at 317. Furthermore, both Mayes and Foss testified that they still owned substantial financial interests in their former employer, Cisco, at the time of trial.  Record Exh. 2A at 166; Exh. 2C at 445.

      Given all of this information, the jury was well aware of the history of friendship and

---

      [10]Hawkins has also argued that several of the exhibits from the expanded record are relevant to the issue of prejudice with respect to claim five.  The court has addressed those arguments below in connection with Hawkins' identical arguments regarding prejudice concerning claim six, ineffective assistance of counsel.  Because the test for prejudice is the same with respect to claims five and six, this court's conclusions contained below in its discussion of the ineffective assistance claim regarding consideration of the exhibits are equally applicable to claim five.

1  loyalty that existed between these witnesses.  When the expanded record is considered

2  with the evidence already before the jury, it is clear that additional evidence of new

3  investment ventures would not have been particularly significant to the jury's assessment of

4  the witnesses' credibility.  Evidence of the witnesses' participation in Foss' CAW venture is

5  no different in nature from evidence presented during trial detailing their financial interest in

6  Cisco or NTI.  *See United States v. Strifler*, 851 F.2d 1197, 1201 (9th Cir. 1988)

7  ("[e]vidence that is merely cumulative is not material").

8          For these reasons, the expanded record does not demonstrate a *Brady* violation.

9  **VI.     Hawkins' Ineffective Assistance of Counsel Claims Fail**

10         Hawkins also claims that his conviction violates the Sixth and Fourteenth

11 Amendments based on ineffective assistance of his trial counsel.  Hawkins specifically

12 points to four alleged deficiencies in trial counsel's assistance, and argues that when these

13 deficiencies are considered separately, and also in conjunction with his other claims, they

14 amount to a violation of his constitutional rights.  These alleged instances of ineffective

15 assistance of counsel include: (1) his counsel's failure to challenge the access date

16 evidence with expert testimony; (2) his counsel's failure to challenge Foss' testimony with

17 other testimony; (3)  his counsel's failure to present expert testimony that NTI had copied

18 part of the PIX source code; (4) his counsel's failure to request a jury instruction on the

19 destruction of evidence; and (5) the cumulative effect of the alleged errors.

20         **A.      Additional Evidence Attached to Federal Habeas Petition**

21         The court has considered the eight exhibits that were attached to Hawkins' federal

22 habeas petition, which were also attached to his state habeas petition, and are relevant

23 only to his claim for ineffective assistance of counsel.  This court may assume that the state

24 appellate courts considered this evidence in denying the habeas petition on the merits, and

25 that it is properly part of the record before this court.  *See, e.g., Greene v. Lambert*, 288

26 F.3d 1081, 1086-87 (9th Cir. 2002) (where the state court issues a "postcard denial," this

27 court construes the denial as one on the merits for federal habeas purposes).  Those eight

28 exhibits include the: (1) Farmer Decl. (Exh. 9); (2) Sayer Decl. (Exh. 10); (3) Ziemba Decl.

**United States District Court**
For the Northern District of California

(Exh. 11); (4) V. Hawkins Decl. (Exh. 12); (5) McKusick Decl. (Exh. 6); (6) Brennan Decl. (Exh. 7); (7) Seder Decl. (Exh. 8); and (8) Licensing Agreement (Exh. 10) (hereinafter referred to as "Exh., Petition").

Unfortunately, Hawkins saw fit to simply attach the above eight exhibits to his federal habeas petition. He has, for the most part, failed to include an adequate discussion of the content and relevance of these exhibits to his federal habeas claim. As a result, the court was required to review the numerous documents filed in conjunction with his state habeas petition to ascertain the purported relevance of the exhibits. The only discussion this court located regarding many of these declarations existed in Hawkins' habeas petition before the state court.

Additionally, the court has also reviewed and considered, to the extent that they are relevant, the eight exhibits attached to Hawkins' traverse that this court permitted to be filed on March 11, 2005. Hawkins asserts that these exhibits are relevant to two sub-claims of his ineffective assistance of counsel claim – those concerning counsel's failure to challenge Foss' testimony and his failure to challenge access date evidence.[11] Additionally, Hawkins argues that several of the exhibits are also relevant to the prejudice issue in conjunction with both claims 5 and 6.

Unlike the eight exhibits attached to the petition, none of these exhibits were considered by the state courts. They include the: (1) Hewitt Decl. (Exh. A); (2) Kryss Decl. (Exh. B); Cuaresma Decl. (Exh. C); Petersen Decl. and 3Com Buyer's Guide (Exh. D); Singh Decl. (Exh. E); Mitnick Decl. (Exh. F); Bartas Decl. (Exh. G); and Pozar Decl. (Exh. H) (hereinafter referred to as "Exh., Traverse").

The court discusses the individual exhibits, to the extent relevant, in the context of the specific sub-claims set forth below. The court also addresses separately below the exhibits that Hawkins claims are relevant to the prejudice issue.

**B.     Analysis**

---

[11]However, the state is correct in noting that none of the eight exhibits pertain specifically to the issue regarding Foss' testimony.

United States District Court
For the Northern District of California

1

### 1.    Legal Standard Generally

2      A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

3 Sixth Amendment right to counsel, which guarantees not only assistance, but effective

4 assistance of counsel.  *Strickland*, 466 U.S. at 686.  The benchmark for judging any claim

5 of ineffectiveness must be whether counsel's conduct so undermined the proper functioning

6 of the adversarial process that the trial cannot be relied upon as having produced a just

7 result.  *Id.*  An accused enjoys the right to effective assistance of counsel whether is

8 counsel is retained or appointed.  *See Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980).

9      In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a

10 petitioner must establish two things.  First, he must establish that counsel's performance

11 was deficient, i.e., that it fell below an "objective standard of reasonableness" under

12 prevailing professional norms.  *Strickland*, 466 U.S. at 687-88.  Second, he must establish

13 that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable

14 probability that, but for counsel's unprofessional errors, the result of the proceeding would

15 have been different."  *Id.* at 694.  A reasonable probability is a probability sufficient to

16 undermine confidence in the outcome.  *Id.*  The *Strickland* framework for analyzing

17 ineffective assistance of counsel claims is considered to be "clearly established Federal

18 law, as determined by the Supreme Court of the United States" for the purposes of 28

19 U.S.C. § 2254(d) analysis.  *See Williams (Terry) v. Taylor*, 529 U.S. 362, 404-08 (2000).

20      With regard to the first prong of the *Strickland* test, the relevant inquiry is not what

21 defense counsel could have done, but rather whether the choices made by defense

22 counsel were reasonable.  *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).

23 Judicial scrutiny of counsel's performance is highly deferential, and a court must indulge a

24 strong presumption that counsel's conduct falls within the wide range of reasonable

25 professional assistance.  *See Strickland*, 466 U.S. at 689; *Wildman v. Johnson*, 261 F.3d

26 832, 838 (9th Cir. 2001) (finding no deficient performance by counsel who did not retain a

27 ballistics expert on a menacing charge where the same expert had been used in the

28 successful defense of the same defendant on a felon-in-possession charge); *Sanders v.*

United States District Court

For the Northern District of California

1  *Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  *But cf. United States v. Palomba*, 31 F.3d

2  1456, 1466 (9th Cir. 1994) (presumption of sound trial strategy not applicable where indicia

3  of tactical reflection by counsel on issue absent from record).

4      The reasonableness of counsel's decisions must be measured against the prevailing

5  legal norms at the time counsel represented the defendant.  *See Wiggins v. Smith*, 539

6  U.S. 510, 523-25 (2003) (citing American Bar Association professional standards and

7  standard practice in capital defense at pertinent time); *Jennings v. Woodford*, 290 F.3d

8  1006, 1016 (9th Cir. 2002) (deficient performance where counsel who had settled on alibi

9  defense failed to investigate possible mental defense despite state supreme court decision

10  before trial that in such instances counsel is not excused from investigating the potential

11  mental defense).  It is unnecessary for a federal court considering a habeas ineffective

12  assistance claim to address the prejudice prong of the *Strickland* test if the petitioner

13  cannot establish incompetence under the first prong.  *See Siripongs v. Calderon*, 133 F.3d

14  732, 737 (9th Cir. 1998).

15      Where the defendant is challenging his conviction, the appropriate question is

16  "whether there is a reasonable probability that, absent the errors, the fact finder would have

17  had a reasonable doubt respecting guilt."  *Strickland*, 466 U.S. at 695.  If the state's case

18  was weak, the potential prejudicial effect of counsel's performance must be evaluated in

19  light of that fact.  *See Johnson v. Baldwin*, 114 F.3d 835, 838 (9th Cir. 1997).  Conversely,

20  if the defense's case was strong, there is a much lesser likelihood of a reasonable

21  probability that the result of the trial would have been different.  *See, e.g., Greene v. Henry*,

22  302 F.3d 1067, 1072-74 (9th Cir. 2002) (finding no prejudice based on failure to investigate

23  and call new witnesses where case "was already as good as it was going to get" from

24  defense lawyer's point of view – rape "victim" changes her story and testifies that she was

25  not raped, corroborating witness is a crack dealer who lies even about his own name, and

26  the medical evidence is weak – and where nothing testified to by new witnesses would

27  have undermined the prosecution's eyewitnesses or physical evidence).  "'[P]rejudice may

28  result from the cumulative impact of multiple deficiencies.'"  *Harris v. Wood*, 64 F.3d 1432,

United States District Court
For the Northern District of California

1  1438 (9th Cir. 1995) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en

2  banc), *cert. denied*, 440 U.S. 974 (1979)).  In other words, in a case with various

3  deficiencies, there may be a reasonable probability that, absent the various deficiencies,

4  the outcome of the trial might well have been different.

5      A difference of opinion as to trial tactics does not constitute denial of effective

6  assistance, *see United States v. Mayo*, 646 F.2d 369, 375 (9th Cir.), *cert. denied*, 454 U.S.

7  1127 (1981), and tactical decisions are not ineffective assistance simply because in

8  retrospect better tactics are known to have been available.  *See Bashor v. Risley*, 730 F.2d

9  1228, 1241 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).  Tactical decisions of trial counsel

10 deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations;

11 (2) counsel makes an informed decision based upon investigation; and (3) the decision

12 appears reasonable under the circumstances.  *See Sanders*, 21 F.3d at 1456.

13                **2.    Hawkins' Reliance on the Expanded Record Re: Prejudice**

14     In support of his argument that prejudice can be demonstrated with respect to all of

15 the ineffective assistance of counsel sub-claims, Hawkins relies in part on seven

16 declarations from the expanded record before this court.[12]  Those declarations were not

17 before the trial court and also were not before the state appellate courts on appeal or in

18 conjunction with Hawkins' habeas petitions there.  He argues that these exhibits

19 demonstrate generally the weakness of the state's case against him, and that, therefore,

20 they contribute to a reasonable probability of a different result.

21     The court has reviewed the declarations and Hawkins' respective arguments

22 regarding their relevance, and a summary follows:

23                **a.    Hewitt Declaration (Exhibit A to Traverse)**

24     Jeffrey Hewitt wrote source code for Hawkins and Larry Coryell in 1996 while

25 Hawkins was developing programs for his company Meridian.  In the declaration, Hewitt

26 states that he wrote the source code using documentation that he obtained directly from

27 ────────────────

28     [12]Hawkins also asserts that the same prejudice arguments apply to claim five, the *Brady* claim.  The court's analysis and conclusion with respect to claim six for ineffective assistance of counsel applies equally to claim five.

1  3Com, and that he was never offered PIX source code to assist him.  He further states that

2  he never saw any PIX code, nor did he hear Hawkins or anyone else talk about PIX code.

3      Hawkins contends that Hewitt's declaration demonstrates that he did not utilize PIX

4  source code in the creation of Aegis.

5             **b.**      **Declaration of Mike Kryss (Exhibit B to Traverse)**

6      Mike Kryss was the Vice President of Sales for Meridian in 1997.  The

7  declaration describes some of the preparations that he, along with Hawkins and others at

8  Meridian, took in anticipation of the Interop trade show in May 1997, where Mayes and

9  Cisco first suspected that Hawkins stole proprietary information from NTI.  Kryss states that

10  neither he nor anyone else at Meridian was trying to hide the existence of the Aegis product

11  from Cisco.  He indicates that in the trade show booth, there was only one computer, which

12  was a notebook computer.  According to the declaration, that computer displayed the

13  Windows 95 Graphical User Interface for Aegis, and did not display any source code or

14  other proprietary information.  Kryss states that after Mayes came to the booth, at no time

15  did anyone quickly shut down the computers.

16      Hawkins contends that Kryss' declaration undermines Mayes' testimony regarding

17  Meridian's booth at the Las Vegas show.

18             **c.**      **Declaration of Chester Cuaresma (Exhibit C to Traverse)**

19      Chester Cuaresma also worked for Meridian in 1997, where he wrote programs.

20  According to his declaration, Cuaresma wrote the Aegis Graphics User Interface program.

21  He indicates that he wrote this program from scratch in 1997, and did not have access to

22  the PIX source code, nor did he ever see the PIX source code.  Cuaresma further states

23  that he was never offered any source code by Hawkins or anyone else at Meridian to assist

24  him in developing the program.

25      Hawkins asserts that Cuaresma's declaration supports his argument that Aegis was

26  developed from scratch.

27             **d.**      **Declaration of James Petersen and 3Com Buyer's Guide**
                      **(Exhibit D to Traverse)**

28
    James Petersen is the Senior Director of Corporate Branding at 3Com Corporation.

1   Petersen was responsible for the publication of the 3Com Buyer's Guide.  Attached to his

2   declaration are pages from Buyer's Guides and a Newsletter from 1995 and 1996.  It also

3   states that the 3C590 Ethernet Adaptor was being actively marketed and sold until fall

4   1996, and that it was still generally available to the public in February 1997.  Petersen

5   opines in the declaration that the 3C590 product was a suitable choice for a twisted-pair

6   Ethernet PCI Bus Master network interface card.

7        The Buyer's Guide pages describe certain 3Com products, called Bus Master

8   Adapters and Network Interface Cards.  The Bus Master seems to be some sort of software

9   that optimizes network performance, i.e. makes computer networks run faster when they

10  have a lot of data or several programs running simultaneously. The Interface Cards are

11  used to connect PCs to a network.

12       Hawkins is not clear regarding the relevance of these exhibits.

13               **e.        Declaration of Tina Singh (Exhibit E to Traverse)**

14       Tina Singh was the attorney who represented Hawkins in civil matters related to the

15  state criminal charges.  Her declaration describes an Evaluation Agreement that Singh

16  entered into with the attorneys for Cisco, which authorized Galligher to review the Meridian

17  source code.  The declaration indicates that Galligher completed a report in August 1997

18  that was favorable to Hawkins, and that Galligher's findings were inconclusive as to

19  whether the Aegis source code was copied from the PIX source code.  Singh states in the

20  declaration that she was told that Cisco would not file suit against Hawkins if Galligher

21  failed to conclude that Aegis was derived from PIX.

22       The declaration further indicates that one of Cisco's lawyers, Noemi Espinosa,

23  voiced concern that 3Com might be interested in buying Aegis.  Singh states that she tried

24  to arrange a settlement with Cisco, and that during settlement discussions they mentioned

25  the possibility of Cisco purchasing Aegis.  Apparently there were some concerns about

26  antitrust violations, and before the parties reached a settlement, Singh was contacted by

27  another Cisco attorney who informed her that Cisco would no longer deal with her or

28  Hawkins.

United States District Court

For the Northern District of California

**g.      Declaration of John Bartas (Exhibit G to Traverse)**

John Bartas was a professional software engineer.  The declaration describes Bartas' professional background and knowledge of computer programming languages. Bartas notes that he reviewed "a variety of documents" prior to forming an opinion as to whether Hawkins used PIX source code in creating the Aegis product.  These documents included the Aegis source code, a case summary provided by Hawkins' counsel, a memo sent from Galligher to Tina Singh, a "Triton Programming" newsgroup e-mail, and the source code from the stock quote program that Hawkins and Foss worked on together.

Bartas includes an overview of the market for programs like PIX and Aegis in the mid-1990's.  He states that the technology involved in the two programs is relatively simple, and that in-house engineering groups had been able to implement the technology in very short periods of time.  He opines that it would be unlikely for the developers of Aegis to have copied PIX source code, because at the time Aegis was developed, there were large amounts of high quality sample source code for this type of program in the public domain. Bartas also suggests in the declaration that the relative simplicity of the code, as well as the productivity of Hawkins' engineers and the existing public knowledge about the technology, all contributed to an optimal setting for fast production of the Aegis product.

Bartas further states that there is no technically valid basis on which to assert that Aegis and PIX had a common ancestry without closely examining both sets of source code, and that basing such a conclusion only on external characteristics can be misleading.  He also points out that the two programs were written in different languages (PIX in C and Aegis in C++) and that Aegis took advantage of several features unique to C++, which would not be present had the source code been copied or referenced from C.  Bartas opines that if Meridian wanted to borrow ideas or code from PIX, the obvious choice would have been to write Aegis in C.

With regard to the Triton e-mail and the Galligher-Singh fax, Bartas suggests that neither document provides any evidence that Aegis was derived from PIX.  His analysis of the Triton e-mail indicates that Aegis was far from complete on August 27, 1996, contrary

36

United States District Court

For the Northern District of California

1   to Cisco's assertion.  In reviewing the fax, Bartas notes that Galligher did not mention that

2   the two programs might share a common source, and in fact Galligher pointed out the

3   dissimilarities between the programs.  The declaration concludes with Bartas' opinion that

4   the PIX code almost certainly did not enable Hawkins and his associates to create Aegis

5   more rapidly than if they did not have access to it.

6        Hawkins asserts that Bartas' declaration supports his argument that he did not copy

7   from PIX.

### h.        Declaration of Tim Pozar (Exhibit H to Traverse)

9        Tim Pozar is a network engineer in the data telecommunications field.  In sum,

10  Pozar has reviewed both Hawkins' Aegis product and PIX. The declaration describes

11  Pozar's professional experience, and lists the materials that he reviewed, including product

12  manuals for Aegis and PIX.  Pozar states that in his review of the product manuals, he

13  found only vague similarities between the products, and most of the similarities were in the

14  use of standard functions and formats.  He also suggests some problems with Wu's

15  testimony regarding the similarities between the two products.  Pozar gives his opinion that

16  Aegis and PIX do not have the same lineage, but cautions that he has not had an

17  opportunity to review the PIX source code.

18       The state argues that because the above evidence was not introduced at trial and

19  does not directly bear on the merits of claims five and six, Hawkins cannot utilize the

20  evidence in arguing prejudice.  Alternatively, the state argues that if the court "disagrees

21  with [its] evaluation of the insignificance of the declarations used to expand the record, as

22  they relate to the prejudice prong of *Strickland*, . . . that [the claim] is unexhausted"

23  because Hawkins did not present the evidence before the state courts.  According to the

24  state, the petition would need to be dismissed as mixed unless Hawkins can demonstrate

25  his entitlement to a "stay and abeyance."  *See Rhines v. Weber*, 544 U.S. 269, 276-77

26  (2005).

27       Hawkins' supplemental briefs, including his reply, on the issue are unpersuasive.

28  Hawkins has not argued that counsel was ineffective for failing to introduce the seven

United States District Court

For the Northern District of California

1  declarations; nor has he claimed that the state improperly suppressed the declarations.

2  Instead, he simply contends that this court should consider the evidence with respect to the

3  prejudice issue.  He provides no authority for his position that "[a]ssuming . . . that petitioner

4  prevails on the first prong, the expanded record is fully admissible before this court on the

5  issue of prejudice to petitioner."  Nor does Hawkins address the exhaustion issue raised by

6  the state.

7          The Ninth Circuit has indeed endorsed a liberal standard for discovery in habeas

8  cases under Habeas Rule 6(a).  *See, e.g., Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir.

9  2005) (holding that where the evidence sought via a petitioner's discovery request "may

10  well contain favorable, material information," it is "essential" for the petitioner to "develop

11  fully" his or her underlying claim, and the district court is required to grant the petitioner's

12  request pursuant to Rule 6(a)).  Application of this standard to Hawkins' petition resulted in

13  the extensive discovery that took place with respect to claims five and six in this case.

14  While the Ninth Circuit has not offered much additional guidance regarding the parameters

15  and limitations on the review of expanded records in habeas cases, this court cannot

16  imagine that its liberal interpretation of the habeas rules governing discovery, as set forth in

17  *Pham*, means that this court is to relax the deferential standard for reviewing habeas cases

18  and effectively review the cases as a state appellate court would on direct review.

19          In arguing that this evidence is relevant to the issue of any resulting prejudice with

20  respect to claims five and six, it is clear to the court that Hawkins has attempted to

21  introduce this evidence via the "backdoor" with respect to claims two and four.  This

22  evidence that Hawkins asserts is relevant to the prejudice issue is the very evidence that

23  this court already concluded that Hawkins could not introduce with respect to claims two

24  and four[13]  *because* Hawkins had not "exercised diligence in developing" the factual bases

25

26  _____

27          [13]  Those claims, discussed above, are:  (2) that the trial court's admission of evidence
    of his prior misconduct regarding possession of other source code violated Hawkins' due
28  process rights; and (4) that the trial court's admission of computer records that Hawkins
    contends were unreliable violated his due process rights.

United States District Court

For the Northern District of California

1    below.[14] *See* 3/11/05 Order.  A review of this evidence makes it abundantly clear that it is

2    really relevant to claims two and four; and at best, marginally relevant, if at all, to the

3    prejudice issue.  The additional evidence is clearly *not* relevant to Hawkins' trial counsel's

4    performance underlying his ineffective assistance of counsel claim.  In fact, none of the

5    declarations relate to counsel's performance *at all* with respect to the four ineffective

6    assistance sub-claims asserted in Hawkins' federal petition.[15]  And, as noted, nor does

7    Hawkins claim that this particular evidence was improperly suppressed by the prosecution.

8         Because this evidence was not introduced at trial or during state habeas

9    proceedings, Hawkins cannot now introduce it via the "backdoor" in this federal habeas

10   proceeding.  This type of "Monday morning quarterbacking" is not permitted by Ninth Circuit

11   law, *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995), and was not permitted in

12   conjunction with the court's expansion of the record in this case.

13        Additionally, clearly established federal law provides that prejudice is to be assessed

14   by comparing "the evidence that *actually* was presented to the jury with the evidence that

15   might have been presented had counsel acted differently" or with the evidence that was

16   wrongfully suppressed.  *Murtishaw v. Woodford*, 255 F.3d 926, 940 (9th Cir. 2001) (citing

17   *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995)) (regarding ineffective assistance of

18

19        [14]As noted in this court's March 11, 2005 order regarding Hawkins' request to expand
20   the record:

21        the factual predicate of Hawkins' "new" evidence in connection with claims two
           and four could have been raised in the state court proceedings through the
22         exercise of diligence.  *See* § 2254(e)(2)(A)(I).  Hawkins has not demonstrated
           nor explained why the "new" information or evidence submitted with his traverse
23         could not have been raised before the state court on or before the time that he
           filed his state habeas petition in the case on February 27, 2003.  Allowing the
24         introduction of evidence or an evidentiary hearing on issues which could have
           been raised in the state court proceedings would only serve to provide "an
25         alternative forum for trying facts and issues which a prisoner made insufficient
           effort to pursue in state proceedings."  *Williams*, 529 U.S. at 437.

26
           [15]As set forth above, those sub-claims include:  (1) Hawkins' counsel's failure to
27   challenge the access date evidence with expert testimony; (2) his counsel's failure to challenge
     Foss' testimony with other testimony; (3)  his counsel's failure to present expert testimony that
28   NTI had copied part of the PIX source code; (4)  his counsel's failure to request a jury
     instruction on the destruction of evidence;

United States District Court

For the Northern District of California

1   counsel claims); *see also Ross*, 372 F.3d at 1108 (citing *Agurs*, 427 U.S. at 112) (with

2   respect to *Brady* claims, materiality of suppressed evidence should be considered in light of

3   the other evidence admitted at trial); *Kyles*, 514 U.S. at 434 (*Brady* standard for materiality

4   is the same as the standard for determining prejudice with ineffective assistance of counsel

5   claims).  As noted above, the seven declarations are *not* the evidence that Hawkins is

6   claiming "might have been presented had [trial] counsel acted differently" in this case.  That

7   evidence is discussed below with the four sub-claims to Hawkins' ineffective assistance

8   claim.[16]   Moreover, since none of the above evidence was *actually* presented at trial, it

9   cannot and does not assist this court in determining whether prejudice ensued from

10  counsel's failure to present the other evidence, *see infra* n. 16, or from the prosecution's

11  alleged suppression of other evidence.  *See also infra* n. 16.

12         Furthermore, as noted by the state, it is also likely that Hawkins' petition would be

13  considered unexhausted if this court were to assess prejudice in light of evidence not

14  previously before the state courts.  *See Kelly v. Small*, 315 F.3d 1063, 1067 (9th Cir. 2003)

15  (in order to properly exhaust, the specific factual basis of the federal claim also must be

16  presented to the highest state court).   Hawkins apparently concedes that this is the case

17  since he fails to address the exhaustion issue.  The exhaustion rules recognize that it is not

18  the purpose of federal habeas proceedings to permit petitioner's counsel to relitigate the

19  case as, in hindsight, he now sees fit, second-guessing all of trial counsel's decisions and

20  introducing evidence that was clearly available to trial counsel at the time of trial.

21         Accordingly, the court declines to consider the evidence in assessing prejudice with

22  respect to either claims five or six.

23  _____

24         [16]The evidence that Hawkins is claiming "might have been presented" with respect to
    his ineffective assistance of counsel sub-claims includes Daniel Farmer's declaration (Exh. 9,
25  Petition); Kevin Mitnick's declaration (Traverse, Exh. F); Nicholas Sayer's declaration (Exh. 10,
    Petition); G. Paul Ziemba's declaration (Exh. 11, Petition); Veronica Hawkins' declaration (Exh.
26  12, Petition); Marshall McKusick's declaration (Exh. 6, Petition); Thomas Brennan's declaration
    (Exh. 7, Petition); Jonathan Seder's declaration (Exh. 8, Petition); Plan 9 Licensing Agreement
27  (Exh. 10, Petition).  Additionally, regarding Hawkin's *Brady* claim, the evidence that Hawkins
    asserts should have been disclosed is not that in the seven declarations discussed above, but
28  that from the Foss, Mayes, Wu, and Boggess depositions conducted in conjunction with his
    federal habeas petition.

United States District Court

For the Northern District of California

1

### 3.    Failure to Challenge Access Date Evidence

As noted above with respect to claim three, during the trial, defense counsel argued that the evidence regarding the computer-generated records of file access dates was unreliable, and therefore inadmissible.  Record Exh. 2A at 63-64.  The trial court, however, ruled that the computer-generated access dates were admissible so long as the prosecution could establish their reliability.  The prosecution then represented that its computer expert, Galligher, could establish the reliability of the access dates.  Record Exh. 2A at 67-69.

On direct examination, Galligher testified that the access dates were indeed reliable and provided the bases for his opinion.  Record Exh. 2C at 597-598; Exh. 2D at 629, 632-636, 641, 645, 650, 652-655, 663-664.  On cross-examination, defense counsel elicited testimony favorable to Hawkins from Galligher regarding the numerous ways that the access date evidence could have been compromised.  These included Galligher's testimony that:

(1) during the execution of the search warrant, an investigator directed Galligher to disconnect the computer from its wireless internet connection;

(2) a number of Hawkins' colleagues had remote access to his computers and could have accessed his files;

(3) Galligher did not determine whether there was firewall protection between Hawkins' computers, or between his network of computers and the internet connection;

(4) Galligher had no firsthand knowledge of the configuration of Hawkins' computer system;

(5) Galligher did not observe the presence of any security measures to keep "the bad guys" out of the network;

(6) Galligher did not look for evidence of hackers;

(7) a hacker "wouldn't need much" access to the network because Hawkins did not use a password;

(8) a hacker could remotely access Hawkins' network even if he or she did not know his log-in name and could access the computer files;

(9) it would be easy to change the data on the disk used by investigators to download the access dates;

United States District Court

For the Northern District of California

(10) investigators changed the last access dates stored in the computer when they began accessing files on petitioner's computer;

(11) when working on a computer, it is possible to change the access dates;

(12) investigators did not copy or print out the exact times the PIX source code files were last accessed, which would have been helpful in determining if someone had actually accessed a file or simply changed the access dates on several files at the same time as a result of computer function; and because that information was lost when investigators accessed the files, it was no longer possible to determine what time those files were accessed;

(13) it is possible to change a computer's internal clock; and if the clock was modified, the access dates would be unreliable;

(14) if someone had root access to Hawkins' computer, they would be able to change the computer's clock;

(15) many other files besides the PIX source code files were accessed on May 15, 1997; and

(16) Galligher did not know whether Hawkins used the computer on December 5, 1996, or May 15, 1997, and did not know who might have accessed the PIX source code files on those dates.

*See* Record Exh. 2D at 798-808, 814-822, 825-828, 831-839, 842-843, 870-871.

Hawkins now argues that although trial counsel objected to Galligher's testimony as unreliable and elicited the above testimony, his failure to present any expert testimony to counter the prosecution's evidence of the access dates constituted ineffective assistance of counsel.

Hawkins submitted two expert declarations in conjunction with this sub-claim for ineffective assistance of counsel. First, he submitted with his petition the expert declaration of Daniel Farmer, an expert in the area of computer technology. Exh. 9, Petition. Farmer's declaration describes his employment history, which includes positions with Earthlink, Sun Microsystems, and the Computer Emergency Response Team. At each of these companies, Farmer's work was related to computer network security. The declaration also lists several security-related computer programs that Farmer participated in writing, as well as several published papers written by Farmer on the topic of computer security.

Farmer asserts that he has reviewed Galligher's testimony pertaining to his investigation and conclusions regarding access dates on Hawkins' computer. Farmer then

42

United States District Court

For the Northern District of California

1 sets out the basic steps for conducting a computer investigation, and based on his

2 experience in the field of computer security, asserts that, in this case, Galligher did not

3 follow the proper procedures.  According to Farmer, the majority of problems occurred in

4 Galligher's gathering of evidence.  He also lists several problems with the security of the

5 computer in question (known as Camaro).  In addition, Farmer notes that computer clocks

6 are notorious for having problems keeping accurate time.

7        Farmer concludes that given Galligher's procedural errors, the poor security of the

8 computers, and the limited value of the computer clock evidence, "virtually nothing can be

9 concluded based solely on the technical data presented and the methodology used."

10       Hawkins also submitted another expert declaration from Kevin D. Mitnick with his

11 traverse.  Traverse, Exh. F.  Mitnick was an expert hired by Hawkins' state habeas counsel

12 to provide an opinion regarding the reliability of certain computer evidence presented at

13 trial.  The declaration describes Mitnick's professional background in the computer science

14 field, as well as his experience testifying before Congress.  Mitnick also states in the

15 declaration that he was indicted in 1996 on various federal counts related to unauthorized

16 access to computer systems.

17       Mitnick indicates that he has reviewed a partial transcript of Galligher's testimony, as

18 well as a copy of the access log that was admitted into evidence.  Based on his review,

19 Mitnick opines that the prosecution's evidence was unreliable, because investigators

20 disregarded the accepted practices of forensic investigation and compromised the integrity

21 of the data stored on Hawkins' computer.

22       Mitnick's declaration then sets forth a "Statement of Facts," followed by an analysis

23 of the errors made in the investigation and forensic analysis of the computers.  This

24 analysis includes excerpts from the transcript of Galligher's testimony at trial, along with

25 Mitnick's comments about the problems with the testimony.  Mitnick concludes that there

26 was no evidence that the access date evidence was accurate or reliable, and that

27 Galligher's testimony is not supported by the evidence.

28       Hawkins also submitted a number of non-expert declarations relevant to this sub-

43

United States District Court

For the Northern District of California

1    claim, including that of Nicholas Sayer, Hawkins' friend and former coworker.  Sayer

2    worked from 1996-1999 as an independent contractor for Meridian, Hawkins' company that

3    produced the Aegis product.  Exh. 10, Petition.  Sayer, as well as other Meridian

4    employees, had unrestricted access to all of the company's computers, and accessed

5    these computers remotely over the Internet.  Sayer states in his declaration that it is

6    possible that in accessing the computers, he may have unknowingly and unintentionally

7    accessed a certain file (labeled 3c509.c) in a manner that may have altered the file access

8    date.

9         Sayer also asserts that he never observed any Cisco or NTI source code on any of

10   Meridian's computers, including those at Hawkins' residence, and that he observed nothing

11   that would suggest that anyone at Meridian used any non-public documents or sources in

12   creating their product.  Sayer also opines that there was sufficient documentation available

13   from public sources to enable anyone sufficiently skilled to create Meridian's product.

14        Hawkins also included a declaration from G. Paul Ziemba, a former Meridian

15   employee.  Exh. 11, Petition.  Ziemba worked at Meridian from April 1997 through

16   September 1997.  Prior to Ziemba's employment at Meridian, Ziemba and Hawkins

17   discussed possible "encumbrances" that might arise with the Meridian product, due to

18   Hawkins' prior employment with NTI/Cisco.  According to Ziemba, Hawkins made repeated

19   assurances that no such "encumbrances" existed.

20        Ziemba also describes access to Meridian computers, including access to the Aegis

21   software source code repository on a computer at Hawkins' home office.  He asserts he

22   was familiar with the level of sophistication and quality of code produced by large

23   companies, and that in Ziemba's opinion, the Aegis source code was relatively

24   unsophisticated.  Ziemba contends that while working at Meridian, he never knowingly saw

25   or worked on any Cisco source code.  He also opines that automated programs could have

26   accessed files on Meridian's computers, including the ones in Hawkins' home office,

27   without Hawkins' knowledge.

28        Hawkins also submitted a declaration from his sister-in-law, Veronica Hawkins, who

United States District Court
For the Northern District of California

1   worked at Meridian in 1997.  Exh. 12, Petition.  She worked on the business side of

2   Meridian, and not on the technical development of the Aegis product.  She assisted in the

3   Las Vegas trade show in May 1997, at which time Hawkins was also involved primarily in

4   the business planning for the company.  According to Veronica, Paul Ziemba and others

5   did the programming and software development for Meridian in the spring and summer of

6   1997.[17]

7       Hawkins asserts that based on Farmer's and Mitnick's declarations, an expert could

8   have testified that Galligher did not engage in proper computer investigation techniques,

9   and that the investigative errors contributed to the unreliability of the data upon which

10  Galligher relied in concluding that Hawkins had accessed NTI code in May 1997.  Hawkins

11  claims that if his counsel had called an expert to challenge the admissibility of the access

12  date evidence, it is reasonably probable that the trial court would have excluded this

13  evidence, and that there would have been a different result.  Moreover, Hawkins argues

14  that even if the trial court had admitted the evidence in spite of his proffered expert

15  testimony, it is reasonably probable that the jury would have rejected Galligher's testimony

16  and returned a not guilty verdict had his counsel called an expert on the issue.

17      The state counters that Hawkins has not shown that his counsel was ineffective for

18  failing to present expert testimony to rebut the prosecution's claim that the access date

19  evidence was reliable.  It argues that the "self-proclaimed" expert testimony does not

20  _____

21  [17]As noted above, while Hawkins attached these declarations to his federal petition, he
    did not provide any discussion or explanation regarding their relevance in his petition or related

22  briefing before this court.  The only discussion this court located regarding the attached
    declarations was in Hawkins' habeas petition before the state court.  In that petition, Hawkins

23  argues that had trial counsel called Sayer to testify, his testimony would have shown that
    Hawkins' computer was accessed remotely by other employees of his company.  Record

24  Exh.9, State Pet., ¶ 39.  Hawkins further argues that had his trial counsel called Ziemba to
    testify, his testimony could likewise have shown that Hawkins' computer was accessed

25  remotely by other employees of the company.  State Pet., ¶ 39.  Finally, Hawkins argues that
    had his counsel called Veronica Hawkins to testify, her testimony would have shown that

26  Hawkins was not directly involved in the technical development of the Aegis product at the time
    of the alleged illegal access in May 1997.  State Pet., ¶ 39.  He seems to suggest that if

27  counsel had shown that he was primarily involved in business planning at that time, there is
    a reasonable probability that the jury would have found the access date evidence insufficient

28  to prove that Hawkins accessed the data as charged.  Id. at ¶ 40.

United States District Court

For the Northern District of California

present any concrete evidence that the access dates were unreliable, but only offers speculation that the dates may have been changed or modified.  The state contends that because the prosecution had credible evidence that the access dates were accurate, defense counsel could have reasonably concluded that expert testimony would only affect the weight of the access date evidence, and not its admissibility.  It argues further that Hawkins has not shown prejudice, because defense counsel thoroughly cross-examined Galligher regarding the reliability of the access dates, so the jury was already aware of the defense position on the unreliability of the evidence.

Expert testimony is necessary when lay persons are unable to make an informed judgment without the benefit of such testimony.  *See Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) (jury informed that plaintiff exposed to neurotoxic chemicals but not informed of the ramifications of such exposure).  Counsel must conduct an investigation sufficient to allow a determination of what sort of experts need to be consulted.  *See id.* at 1226.  If experts need to be consulted, counsel must provide the experts with information relevant to the conclusions of the expert.  *See id.* at 1227.  Where the evidence does not warrant it, the failure to call an expert does not amount to ineffective assistance of counsel. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (a decision not to pursue testimony by a psychiatric expert is not unreasonable when the evidence does not raise the possibility of a strong mental state defense).

Hawkins has not demonstrated that his trial counsel was deficient in failing to present expert testimony, such as Farmer's or Mitnick's.  While the two experts disagree with Galligher's assessment concerning the reliability of the access date evidence, their opinions in no way dispel Galligher's.  Moreover, as defense counsel's argument during the trial illustrates, counsel was well aware of the potential problems with the reliability of the access dates. Record Exh. 2D at 798-808, 814-822, 825-828, 831-839, 842-843, 870-871.

There are reasonable explanations for Hawkins' counsel's decision not to introduce such expert testimony.  Counsel may have concluded that there was little chance the trial court would exclude Galligher's testimony based on a mere difference of opinion between

46

United States District Court

For the Northern District of California

1  experts as to the reliability of the evidence, and that his time would be better spent

2  concentrating his efforts on attacking the weight of Galligher's testimony rather than its

3  admissibility.  Mitnick's and Farmer's declarations do not present any concrete evidence

4  that the access dates were unreliable, but only offer speculation that the dates may have

5  been changed or modified.  Since the prosecution had credible evidence that the access

6  dates were accurate, defense counsel could have reasonably concluded that expert

7  testimony would only affect the weight of the access date evidence, and not its

8  admissibility.  Moreover, Hawkins has failed to show prejudice in light of the fact that his

9  trial counsel thoroughly cross-examined Galligher regarding the reliability of the access

10  dates.

11      Hawkins' trial counsel appears to have made a tactical decision to rely upon the

12  prosecution's own expert to undercut the prosecution's theory, and this court cannot in

13  hindsight conclude that it was an unreasonable tactic.  *See Bashor*, 730 F.2d at 1241.

### 4.    Failure to Challenge Foss' Testimony

15      Hawkins' second sub-claim regarding ineffective assistance of counsel is also based

16  on his trial counsel's failure to challenge Foss' trial testimony with additional witness

17  testimony.  As noted, during trial, Foss testified that when he and Hawkins were both

18  employed by NTI, he observed Hawkins with source code from another former employer on

19  his computer. The trial court allowed Foss' testimony for the limited purpose of

20  demonstrating Hawkins' intent with respect to the later copying of the PIX source code.[18]

21      Hawkins concedes that his trial counsel objected to Foss' testimony on several

22  grounds, but nevertheless argues that his counsel's failure to call an expert constituted

23  ineffective assistance of counsel.  He argues that an expert's testimony would have shown

24  that the code that Foss allegedly observed on Hawkins' computer was in the public domain,

25  and, therefore, not proprietary.

26  _____

27      [18] However, the trial court ruled, that prior to admission of Foss' testimony, the prosecution was required to show that Foss observed protected, proprietary code on Hawkins'

28  computer.

United States District Court

For the Northern District of California

1      Hawkins submitted with his petition one expert declaration and one non-expert

2  declaration in support of this sub-claim.  Both of those declarations were also submitted

3  with his state habeas petition.

4      Expert Marshall McKusick has a PhD in computer science from UC Berkeley, and

5  was employed by the university as the head of the Computer System Research Group,

6  which released the Berkeley Software Distribution ("BSD").  *See* Exh. 6, Petition.  As noted,

7  BSD is an operating system from which the Sun Operating System is derived, and is

8  available to the public via the internet, free of charge.  McKusick has previously served as

9  an expert witness on software intellectual property issues.

10     McKusick's declaration provides a description of the three string functions that were

11 part of the stock quote program that Hawkins and Foss worked on together while they were

12 both employed at NTI/Cisco.  He states that these string functions are an insignificant part

13 of the stock quote program.  McKusick explains that the string functions are part of a freely

14 available programming language standard.  He further notes that distribution of these string

15 functions in 1984 was a main part of Sun's operating system, and that although the

16 distributions previously required the recipient to possess an AT&T source license, BSD

17 later began to freely redistribute the functions in 1994.  McKusick's declaration also

18 provides the text of the copyright notice/license on the three string functions.  He explains

19 that observing a company copyright on a file does not necessarily mean that the particular

20 code is owned by the company.  McKusick also opines that the string functions at issue

21 were widely known and freely available to practitioners in the field at the time that Hawkins

22 and Foss created their stock quote program, and that Sun could claim no proprietary

23 interest in the implementation of the functions.

24     Hawkins also submitted a declaration from Thomas Brennan, who worked with

25 Hawkins at Sun from 1989 -1990.  *See* Exh. 7, Petition.  Brennan states that while he

26 worked at Sun, he did not have access to SunOS source code, and that the computer

27 systems that he and Hawkins used did not have such code on them.  He also asserts that

28 SunOS source code was tightly controlled by the company.  Brennan contends that he has

48

United States District Court
For the Northern District of California

1   never known Hawkins to be in possession of SunOS source code.

2       Hawkins argues that if his counsel had called McKusick to testify, his testimony

3   would have shown that the code Foss allegedly saw on Hawkins' computer was in the

4   public domain, and that Foss' testimony would have thus been inadmissible under the trial

5   court's preliminary ruling regarding admissibility.  Alternatively, Hawkins contends that even

6   if the trial court nevertheless admitted Foss' testimony, there is a reasonable probability

7   that the jury would have returned a not guilty verdict based on a defense expert's

8   testimony, which would have discredited the prosecution's evidence.

9       Hawkins also argues that trial counsel should have called Brennan, former Sun co-

10  worker, to testify that he worked with Hawkins at Sun, and that neither of them had access

11  to proprietary Sun source code on their computers.  He contends that had this evidence

12  been presented, there is a reasonable probability that the trial court would have excluded

13  Foss' testimony for failing to meet the foundational requirements that it set out.

14      The state counters that Hawkins has not shown that his trial counsel was ineffective

15  for failing to call additional witnesses to rebut Foss' testimony.  It argues that had an expert

16  witness testified to the opinions contained in McKusick's declaration, it would not have

17  significantly aided the defense.  According to the state, the important fact pertaining to

18  admissibility of Foss' testimony was not whether Sun could legally claim a proprietary

19  interest in all portions of its code, but that Sun considered the entire code confidential and

20  that Hawkins possessed such code on his computer.  Because the prosecution established

21  such facts, the state argues that defense counsel could have reasonably concluded that it

22  was pointless to call an expert witness.  The state also asserts that Brennan's testimony

23  would not have significantly aided the defense.

24      As with the preceding sub-claim, defense counsel's decision not to put on additional

25  witness testimony appears to be a reasonable, tactical one.  On cross-examination of Foss,

26  defense counsel elicited testimony very similar to that which Hawkins now claims counsel

27  should have introduced via an expert witness such as McKusick.  Foss testified that the

28  Sun operating system was based on BSD, and that a version of BSD, called "Free BSD"

United States District Court

For the Northern District of California

1   was available to the public on the Internet.  *See* Record Exh. 2C at 450.  Foss further

2   attested that there was, in fact, an overlap between Free BSD and the Sun operating

3   system.  *Id.*  Moreover, the state is correct that Hawkins' colleague, Brennan's testimony

4   that Brennan never witnessed Sun source code on Hawkins' computer does not refute

5   Foss' testimony that Foss did in fact observe such source code on Hawkins' computer.

6   The fact that Hawkins had no official access to the code does not mean that Hawkins was

7   unable to gain access *unofficially*.

8        For these reasons, Hawkins has not shown a deficiency on the part of his trial

9   counsel, nor has he shown a reasonable probability that additional testimony would have

10  affected the verdict.

11              **5.       Failure to Present Evidence of Copying by NTI**

12       Like the preceding two sub-claims, Hawkins' third sub-claim for ineffective

13  assistance of counsel also concerns his trial counsel's decision not to present additional

14  expert testimony.  Hawkins claims that counsel should have presented testimony that NTI,

15  Hawkins' former employer that helped pursue the charges against Hawkins for theft of the

16  PIX source code, had itself allegedly copied part of the PIX source code.  In support,

17  Hawkins submitted an expert declaration and a licensing agreement, both of which were

18  also submitted with his state habeas petition.

19       Jonathan Seder has a masters degree from Harvard Business School, and

20  professional experience with the development of computer software.  Exh. 8, Petition.

21  Seder reviewed a disk containing the PIX source code, as well as a CD-ROM containing

22  computer source code, which Seder refers to as "Plan 9."  Plan 9 is the AT&T program from

23  which Hawkins claims NTI copied part of the PIX source code.  Seder states that he

24  searched for a copyright notice in PIX, and the notice he found contained the following

25  language: "[t]he above copyright notwithstanding, I think that some of this code came from

26  anonymous ftp @ research.att.com."[19]  Seder further asserts that the PIX and Plan 9

27

28
   _____

        [19]The notice to which Seder refers does not clarify the source of the statement.

United States District Court

For the Northern District of California

1   source codes contain certain functions that are nearly identical, and opines, on this basis,

2   that the codes have a common origin.

3       Hawkins also attached a Licensing Agreement pertaining to the Plan 9 software.

4   Under the Agreement, AT&T granted a non-transferable license to a customer to use the

5   software.  Exh. 10, Petition.  The Agreement indicates that AT&T owns the software, and

6   that the software is protected by copyright and trade secret laws.  It further states that the

7   licensee may not use, copy or transfer the software, in source or object form, to any third

8   party.  The Agreement also contains a provision stating that any modification or derivative

9   work of the software will be treated as if it were part of the software itself.

10      Hawkins contends that trial counsel should have presented evidence that the

11  developers of the PIX source code had copied part of the code from another source, thus

12  infringing on a copyright and breaching a licensing agreement.   He argues that if counsel

13  had called Seder as an expert witness, Seder would have testified that part of the PIX

14  source code is taken almost verbatim from the Plan 9 source code.

15      Hawkins notes that if expert testimony had been presented that NTI had illegally

16  copied parts of NTI's PIX source code, it would not have been able to claim any value in

17  the code.  Additionally, he notes that such evidence would have entitled him to a jury

18  instruction regarding the diminished value of any copied code.   Specifically, Hawkins

19  asserts that had the expert testimony been presented, counsel could have requested a jury

20  instruction, which would have provided that NTI/Cisco could not claim damages in excess

21  of $100, due to the infringement.[20]  According to Hawkins, given such a jury instruction, it is

22  reasonably probable that the request would have been granted, and that the jury would not

23  have convicted him, because the amount of damage is critical to conviction under the

24  statute.

25      The state counters that Hawkins has not shown that counsel was ineffective for

26

27  _____

28      [20] The relevant statute, § 502(c)(2) of the California Penal Code, which forbids the unauthorized copying of information from computers, requires the prosecution to prove that the item copied had a value in excess of $100.  1989 Cal. Legis. Serv. 1357 § 1 (West).

51

United States District Court

For the Northern District of California

1    failing to present expert testimony regarding the incorporation of AT&T source code into the

2    PIX source code.  The state points out that defense counsel cross-examined Brantley

3    Coile, the programmer who wrote the PIX source code, regarding the infringement Hawkins

4    alleges.  It argues that defense counsel could have reasonably concluded that expert

5    testimony, such as Seder's, was unnecessary in light of the fact that Coile had already

6    admitted his use of the AT&T source code in writing PIX.  The state further asserts that

7    counsel could have reasonably concluded that the expert testimony was vulnerable to

8    attack, or that spending too much time on the issue risked alienating the jury.

9          The court concludes that Hawkins has not shown that his trial counsel was

10   ineffective for failing to present expert testimony regarding the incorporation of AT&T

11   source code into the PIX source code.  Defense counsel thoroughly cross-examined Coile,

12   PIX code program writer, about the infringement issue.  Record Exhibit 2C, at 500-501.  He

13   freely admitted that in writing the PIX source code, he consulted various outside code, and

14   acknowledged his uncertainty regarding the source of some of the outside code.  Record

15   Exh. 2C at 476-477; 562-565.  Coile also admitted on cross-examination that he owned a

16   copy of AT&T's Plan 9 source code, and was aware that Plan 9 was the property of AT&T

17   at the time it was included in the PIX source code, and that he had never received a

18   complaint regarding his utilization of the code from AT&T or its successor, Lucent

19   Technologies.  *Id.* at 566.

20         Therefore, defense counsel could have reasonably concluded that expert testimony

21   such as Seder's presented by Hawkins was unnecessary in light of the fact that Coile

22   already admitted to using outside source code in writing the PIX source code.  *See*

23   *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).  Moreover, as the state

24   notes, defense counsel was clearly aware of Seder's opinion at the time of trial since he

25   had, in fact, retained Seder as an expert for trial.  *See* Record Exh. 2A at 33.  Thus,

26   defense counsel appears to have made a tactical decision *not* to call Seder to testify; a

27   decision that, like the ones above, this court cannot in hindsight deem unreasonable.

28         Furthermore, because the jury was already aware of the defense's position that PIX

was worthless due to the alleged copyright infringement, there can be no prejudice to Hawkins. *Id.*

### 6. Failure to Request Jury Instruction regarding Destruction of Evidence

Hawkins' fourth sub-claim concerns his trial counsel's decision not to request a jury instruction on the destruction of evidence.

At trial, the prosecution's expert, Galligher, testified that prior to accessing the files on Hawkins' computer, in January 1998, the investigators copied and printed out a hard copy computer-generated list of dates regarding when the PIX source code files had been last accessed on the computer. The investigators made this back-up list because they were aware of the fact that their subsequent access of Hawkins' files would alter the computer-generated access dates. At the time they made the back-up list, the investigators included only the dates of access - not the exact times. As expected, after investigators subsequently accessed and reviewed Hawkins' files, the computer-generated access dates were indeed altered. As a result, they are no longer accurate.

In *California v. Trombetta*, the United States Supreme Court held that the government's failure to preserve evidence violates a defendant's due process rights when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). In *Arizona v. Youngblood*, "the Court added the additional requirement," *see United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993), that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." 488 U.S. 51, 58 (1988).

However, Hawkins does not argue that the state's destruction of the evidence violated his due process rights; nor has he alleged bad faith on the part of the prosecution. Instead, he contends that his counsel should have requested that the court instruct the jury

53

United States District Court

For the Northern District of California

1   regarding the destruction of the access date information.  Hawkins argues that it is

2   reasonably probable that a jury so instructed would not have returned a guilty verdict,

3   because the access date evidence was critical to the prosecution's case.

4        The state, on the other hand, does not counter that the instruction was unwarranted.

5   It responds that there were a number of tactical reasons that could explain counsel's failure

6   to request the instruction, including the fact that counsel may not have wanted to draw

7   additional attention to the access evidence and that counsel may have determined that

8   reminding the jury regarding the destruction of evidence throughout the trial and during his

9   closing argument was sufficient.

10       A court may provide a limiting jury instruction to cure potential prejudice resulting

11  from destroyed evidence.  *See United States v. Carreno*, 363 F.3d 883, 888-89 (9th Cir.

12  2004) *rev'd on other grounds by* 125 S.Ct. 1000 (2005).  Federal law is clear that a trial

13  court is not required to give an instruction unless the evidence warrants it.  *See Hopper v.*

14  *Evans*, 456 U.S. 605, 611 (1982); *Menedez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir.

15  2005).

16       Counsel's failure to request the instruction in this case was not unreasonable.

17  Hawkins concedes, and the record confirms, that counsel had raised the issue throughout

18  the trial.  *See Weighall v. Middle*, 215 F.3d 1058, 1063 (9th Cir. 2000) (where counsel's

19  closing argument and other arguments throughout trial already presented defense theories

20  covered by jury instruction, counsel's failure to request instruction was not unreasonable).

21  Because there was no evidence that the state had destroyed the evidence in bad faith,

22  counsel could reasonably rely on his numerous references to the alleged destruction

23  throughout the trial without seeking additional remedies or sanctions.  However, even if this

24  court were to find that counsel's failure to request the instruction constituted deficient

25  performance, this sub-claim fails because Hawkins cannot demonstrate prejudice since

26  there is nothing to suggest that the evidence destroyed was exculpatory.  Moreover, the

27  jury was well aware of the alleged destruction of the access evidence.

28       **7.   Cumulative Effect**

54

United States District Court
For the Northern District of California

1    Finally, Hawkins argues that these errors cumulatively require reversal of his

2  conviction.   "Cumulative error applies where although no single trial error examined in

3  isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors

4  may still prejudice a defendant." *Mancuso v. Oliverez*, 292 F.3d 939, 957 (9th Cir. 2002).

5  Because there was no single constitutional error in this case, there can be no cumulative

6  effect.

7    In sum, Hawkins does not satisfy the requirements of *Strickland*, as he has not

8  established that his trial counsel's performance fell below an objective standard of

9  reasonableness.  Despite Hawkins' assertions to the contrary, the expanded record

10  provides little support for his claim of ineffective assistance of counsel, and much of the

11  new evidence would have been cumulative to testimony elicited by defense counsel on

12  cross-examination of prosecution witnesses.  Additionally, it is not reasonably probable that

13  Hawkins would have received a more favorable verdict had his trial counsel presented the

14  evidence included in the expanded record.

15                                  **CONCLUSION**

16    For the reasons set out above, Hawkins' petition for a writ of habeas corpus is

17  DENIED.

18

19  **IT IS SO ORDERED.**

20  Dated: September 22, 2006

21                                          _____
                                            PHYLLIS J. HAMILTON
22                                          United States District Judge

23

24

25

26

27

28